# United States Court of Appeals
## For the First Circuit

---

No. 01-1584

UNITED STATES OF AMERICA,

Appellee,

v.

SOUPHAPHONE CHANTHASENG,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, <u>Senior U.S. District Judge</u>]

---

Before

Selya and Lipez, <u>Circuit Judges</u>
and Singal,* <u>District Judge</u>.

---

<u>Leo T. Sorokin</u>, Federal Defender Office, for appellant.
<u>Paul Levenson</u>, Assistant United States Attorney, with whom <u>James B. Farmer</u>, United States Attorney, was on brief, for the United States.

---

December 19, 2001

---

*Of the District of Maine, sitting by designation.

**SINGAL, <u>District Judge</u>.** Souphaphone Chanthaseng pleaded guilty to three counts of making false bank statements in violation of 18 U.S.C. § 1005. At sentencing, the district court adjusted her offense level upwards for abuse of a position of trust, pursuant to section 3B1.3 of the United States Sentencing Guidelines. Ms. Chanthaseng now appeals, challenging the district court's decision to apply the enhancement. We affirm.

## I. BACKGROUND

Between May 1999 and June 2000, Souphaphone Chanthaseng stole nearly one million dollars from Fleet Bank. The particulars of her scheme being essential to our inquiry, we recount them here in detail.[1]

Fleet Bank hired Ms. Chanthaseng as a bank teller in 1994, and promoted her in succession to the positions of head teller, vault teller and branch operations supervisor. By the spring of 1999, she held the latter two positions simultaneously while working at a Fleet branch in Waltham, Massachusetts. Ms.

---

[1] We draw the facts in this case from the sentencing transcript, presentence report and materials used by the district court. <u>See, e.g.</u>, <u>United States</u> v. <u>Gill</u>, 99 F.3d 484, 485 (1st Cir. 1996) (citing <u>United States</u> v. <u>Egemonye</u>, 62 F.3d 425, 426 (1st Cir. 1995)). In particular, we adopt most of the relevant facts from an investigatory report conducted by Fleet Bank and submitted as an addendum to appellee's sentencing memorandum.

Chanthaseng's titles made her a mid-level employee.  Her duties gave her access to the bank's computerized accounting system and vault, and she supervised junior bank tellers.  However, Fleet's internal regulations required the branch manager to review and audit much of her work.

Some of Ms. Chanthaseng's job duties that were subject to supervisory review involved the method by which the bank accounted for cash deposits from its commercial customers. These customers often brought bags of cash to the bank labeled with a "rapid deposit ticket" denoting the amount of cash to be deposited.  Rather than confirming the bag's contents on site, the bank immediately credited the customer's account with the amount shown on the ticket, and sent the bag to an outside vendor for counting.  While the cash was in transit, the rapid deposit ticket served as a placeholder for the actual funds on the bank's ledger.  When the vendor returned the counted funds to the bank, the ticket was cancelled out of the accounting system and replaced with a corresponding entry for cash in the vault.

Fleet's regulations required its employees to take numerous security measures in conjunction with rapid deposit ticket transactions.  First, although any teller at the bank could accept rapid deposit tickets from customers, a senior teller had

to countersign every deposit. Second, no senior teller was authorized to countersign a rapid deposit ticket that he or she personally had accepted from a customer. Third, the bank regularly generated reports of rapid deposit transactions that the branch manager was to review, and finally, if rapid deposit tickets remained outstanding on the bank's ledger for more than thirty days, Fleet's "Central Operations Center" would red-flag them for investigation.

As vault teller and branch operations supervisor, Ms. Chanthaseng was one of the few employees at her branch authorized to countersign other tellers' rapid deposit tickets. As noted, however, internal bank regulations forbade her from countersigning her own tickets. Nonetheless, Ms. Chanthaseng's branch manager permitted her to do so, in violation of the regulations.

Therein lay the key to her crime. Ms. Chanthaseng successfully hoodwinked her employer by processing rapid deposit tickets reflecting deposits that were never actually made to the bank, and countersigning them. The phony deposits appeared on the ledger to be cash in transit, immediately available for withdrawal. Thus, Ms. Chanthaseng single-handedly created in the accounting system a nonexistent cache of in-transit funds that she could deposit into accounts she controlled. She would subsequently cancel out the false tickets she had written, and

replace them with new tickets for equal or larger amounts, thus concealing her crime by constantly carrying in-transit balances on the ledger. A physical count of the cash in the vault, however, would have revealed a significant cash shortfall.

A physical count of the vault cash did in fact occur when bank security employees performed a surprise audit of the branch in April 2000. Taken off guard, Ms. Chanthaseng feigned inability to open the vault, buying her enough time to enter a large balancing entry in the accounting system. When an employee of the safe company finally opened the vault, the correct amount of cash appeared to be there.

The balancing transaction did not go unnoticed, however. Fleet's Central Operations Center contacted the branch manager about it, and he in turn referred the inquiry about the anomalous entry to Ms. Chanthaseng. By recording several additional entries in the system, she was able to conceal her crime. The branch manager did not pursue the issue further.

In all, Ms. Chanthaseng's scheme racked up gains of nearly one million dollars in just under a year. Then, in May 2000, Fleet sold its Waltham branch to Sovereign Bank. As a result of the sale, Ms. Chanthaseng lost access to the bank's accounting system while three rapid deposit tickets were still outstanding. When the tickets were not cancelled out of the system after thirty days, Fleet immediately began an investigation. In short

order, bank investigators traced the transactions to Ms. Chanthaseng, and she admitted to her wrongdoing.

Several months later, Ms. Chanthaseng pleaded guilty to three counts of making false bank statements in violation of 18 U.S.C. § 1005. At sentencing, the district court ratcheted up her offense level by two levels for abuse of a position of trust, pursuant to section 3B1.3 of the United States Sentencing Guidelines. The district court did not, however, explicitly apply the appropriate legal standard to the facts in making the enhancement. The propriety of this adjustment is now before us.

## II. LEGAL DISCUSSION

Section 3B1.3 of the Sentencing Guidelines is familiar ground for the court. We have previously ruled that section 3B1.3 permits a court to increase a defendant's offense level by two levels if the defendant (1) occupied a position of trust vis-à-vis her employer; and (2) utilized this position of trust to facilitate or conceal her offense. See, e.g., United States v. Reccko, 151 F.3d 29, 31 (1st Cir. 1998); United States v. Gill, 99 F.3d 484, 489 (1st Cir. 1996). While we address a district court's interpretation of section 3B1.3 in this regard de novo, we review its application of the Guideline to the facts only for clear error. See United States v. Sotomayor-Vazquez, 249 F.3d 1, 19 (1st Cir. 2001). In a case such as this one, in

which the district court announced its decision to adjust upward without subsidiary findings of fact, we "review the evidence and the result, and not the reasoning by which the result was reached by the district court." United States v. Tracy, 36 F.3d 199, 203 (1st Cir. 1994). We therefore review the evidence to determine if it satisfies the elements of a section 3B1.3 adjustment.

A.  Position of Trust

Appellant first argues that her job did not have the hallmarks of a position of trust. Our opinions in Reccko and United States v. O'Connell, 252 F.3d 524 (1st Cir. 2001), have made clear that a "position of trust," for the purposes of section 3B1.3, is "characterized by professional or managerial discretion." Id. at 528; Reccko, 151 F.3d at 31 (quoting USSG § 3B1.3). This requirement is paramount. Although intuition may suggest that a wide variety of vocations should be thought of as positions of trust, only those endowed with "substantial discretionary judgment that is ordinarily given considerable deference" are subject to the enhancement. USSG § 3B1.3 cmt. 1. Compare Reccko, 151 F.3d at 31 (receptionist/ switchboard operator at police station did not occupy a position of trust, even though job allowed her to warn criminals about police activity) with Sotomayor-Vazquez, 249 F.3d at 19-20 (consultant

occupied position of trust where he controlled the finances of health services organization and was the "heart and soul" of the operation).

Appellant does not offer an alternate interpretation of section 3B1.3. Rather, she insists that the district court committed clear error in finding that she possessed substantial professional or managerial discretion. We cannot agree. Several pieces of evidence suggest that appellant possessed substantial discretionary judgment. To begin with, she had the authority to countersign rapid deposit tickets. Only a few personnel within the bank were given this power, and exercising it affected the bank's financial well-being by making funds credited to accounts via the rapid deposit ticket process available for immediate withdrawal. Cf. USSG § 3B1.3 cmt. n. 1 (bank executive's fraudulent loan scheme worthy of abuse of position of trust adjustment).

Moreover, in appellant's case it is apparent that her branch manager consistently failed to review her rapid deposit ticket approvals, essentially making her the branch's sole decision-maker for those transactions and allowing her to freely countersign her own tickets. Appellant believes this fact works in her favor, because her actions were contrary to bank policy. We disagree. This court has held that the relevant inquiry in cases such as this one is whether a person *in fact* occupied a

position of trust, rather than whether the person's title or official job description contained a discretionary element. See Gill, 99 F.3d at 489. Thus in Gill, we found that a defendant who had posed as a practicing psychologist had abused a position of trust in relation to his "patients," even though he was not legally licensed. Id. This case is no different. Although it was against bank regulations for appellant to countersign rapid deposit tickets at will, the bank manager's laxity effectively made that a central element of her position.

The branch manager added to the discretionary nature of appellant's job by referring the follow-up of an anomalous balancing entry to her. We consider the task of investigating and reporting on potentially fraudulent transactions a discretionary job function. At oral argument, appellant suggested that "referred" mischaracterizes the nature of the branch manager's inquiry into the balancing entry. She insists instead that the manager merely queried her about the entry, and failed to follow up on her response. The record plainly states, however, that the branch manger "referred" the matter to Ms. Chanthaseng. Appellant did not object to this characterization in the proceedings below, and we decline to indulge her alternate explanation at this stage. See United States v. Approximately Two Thousand, Five Hundred Thirty-Eight Point Eighty-Five Shares etc., 988 F.2d 1281, 1288 n. 9 (1st Cir.

1993) (counsel's representation of fact on appeal not a substitute for record showing).


B. Use of Discretion to Facilitate or Conceal Crime

Proceeding to the second prong of the analysis, we must decide whether appellant's substantial discretionary judgment facilitated or concealed her crime. There can be no doubt that it did. Because the bank manager allowed appellant to have the last word on rapid deposit ticket transactions, she was able to approve her own falsified tickets free from the danger of oversight. This freedom clearly facilitated her crime. By the same token, when the branch manager referred investigation of the anomalous balancing entry to appellant, appellant enjoyed the freedom to conceal her misdeeds by recording several more entries without fear of oversight. The evidence very clearly supports the second element of our section 3B1.3 analysis.

## III.   CONCLUSION

While we are cognizant that the district court did not explicitly engage in the thorough, two-step analysis that this case merited, it reached the correct result. There is sufficient evidence in the record to defeat the argument that the district court's application of the section 3B1.3 enhancement was clear error. For that reason, we affirm.

**<u>Affirmed</u>**.