# United States Court of Appeals
## For the First Circuit

No. 07-2414

UNITED STATES OF AMERICA,

Appellee,

v.

KAREN L. SICHER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris E. Lasker, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

Syrie D. Fried, Office of the Massachusetts Federal Defender,
for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, and Linda M. Ricci,
Assistant United States Attorney, were on brief, for appellee.

August 7, 2009

**LYNCH**, **Chief Judge**. This sentencing appeal primarily raises the question of what evidence is sufficient to establish that the defendant held a position of trust for purposes of U.S.S.G. § 3B1.3 to support the imposition of a sentencing enhancement.

Defendant Karen Sicher, who was the sole employee of a surgeon and the charitable foundation for children's medical care he started, pled guilty to ten counts of uttering forged securities, in violation of 18 U.S.C. § 513, ten counts of health care program theft, in violation of 18 U.S.C. § 669, and six counts of income tax evasion, in violation of 26 U.S.C. § 7201. The district court imposed a sentence of 36 months' imprisonment on each count to be served concurrently, followed by 36 months of supervised release, and restitution in the amount of $334,639.

Sicher challenges her sentence on two grounds. First, she contends that the district erred in imposing a two-level sentencing enhancement for abuse of a position of trust, U.S.S.G. § 3B1.3. That enhancement increased her Guidelines sentencing range from 24 to 30 months to 30 to 37 months. Second, she argues the district court failed to consider evidence of her mental health, which she claims merits a downward variance. Finding no error, we affirm.

The following evidence was part of the record before the district court at sentencing. The district court at sentencing is entitled to draw "fair inference[s]," United States v. Tejada-Beltran, 50 F.3d 105, 113 (1st Cir. 1995), from the evidence before it.[1] United States v. Marceau, 554 F.3d, 24 (1st Cir. 2009) ("A sentencing court is entitled to rely on circumstantial evidence and draw plausible inferences therefrom." (internal citations omitted)).

For ten years, Sicher worked as an administrative assistant and secretary to Dr. David S. Walton, a surgeon in ophthalmology specializing in children's glaucoma, a leading cause of blindness for infants and toddlers. Dr. Walton was a "busy and focused surgeon" who had a heavy load of clinical duties and significant teaching responsibilities at Harvard Medical School, where he was a Professor of Ophthalmology. He spent long hours tending to his medical responsibilities.[2]

---

[1] The court is not restricted to drawing only those inferences compelled by the evidence. See United States v. Olivero, 552 F.3d 34, 38-39 (1st Cir. 2009) ("If the facts plausibly support competing inferences, as here, a sentencing court cannot clearly err in choosing one.").

[2] Dr. Walton's testimony was that the practice was "special place" in a unique environment that focused on particularly "complex and difficult patients." While ophthalmologists ordinarily see 50 to 60 patients a day, Dr. Walton saw five to six patients on a busy day, spending considerable time with each. This close-knit medical practice had a small roster of patients whom Dr. Walton treated more intensively. Patients began seeing Dr. Walton

Dr. Walton relied heavily upon the defendant, his sole employee and "trusted representative," to run his medical office while he focused on these other demands. Indeed, Sicher perceived herself as having essential managerial responsibilities. She told the government in interviews that she took care of Dr. Walton on a day-to-day basis and that, for example, Dr. Walton did not know how to use an ATM. Utilizing her position as his assistant, Sicher stole at least $150,000 from payments to his medical practice.

In addition, Sicher played a second role which is particularly significant to the question of whether the enhancement was correctly applied. For seven of those ten years, for an additional monthly payment, she also handled all administrative tasks for the Children's Glaucoma Foundation ("CGF"). CGF was a non-profit organized by Dr. Walton initially and dedicated to supporting programs for children's glaucoma sufferers. The organization raises money and provides grants in support of programs to increase awareness of children's glaucoma, two university based research studies on childhood glaucoma, and support of physician training in the care of affected children. The record before us does not show how many funds were raised for CGF, but the records show Sicher stole approximately $193,000 of those funds. Many families whose children were treated by Dr.

---

as newborns, and he continued treating them through their teenage years.

Walton also devoted their financial and personal energies to supporting CGF.

The foundation had only two functions: fundraising and distributing the funds it raised through grants. Only two people were involved in the day-to-day management of CGF: Dr. Walton and Sicher. As said, Dr. Walton spent almost all of his time and energies in providing medical treatment to his patients, as well as fulfilling his academic and teaching responsibilities. This meant that the other responsibilities for CGF, particularly the management of fundraisers, fell largely on Sicher.

A.      Sicher's Dual Job Responsibilities

Hired in 1995, Sicher was Dr. Walton's sole employee and was responsible for managing his medical practice. Her job responsibilities in Dr. Walton's practice included welcoming patients, scheduling appointments, doing the bookkeeping, accepting and depositing co-payments and medical reimbursement checks, and receiving the practice's bank account statements. While he was busy providing medical services, Dr. Walton relied on the defendant, his "trusted representative in the office environment," to manage all the financial and administrative functions of the office. Through her position, she became personally close with many of the families of Dr. Walton's patients.

In 1998, upon the founding of CGF, Dr. Walton asked Sicher to take on all administrative responsibilities for CGF. Her

formal duties included accepting and depositing donations for CGF, informing Dr. Walton of any donations, and opening and reviewing CGF's monthly bank statements. In practice, Sicher's activities went well beyond her formal duties. Her duties were essential to the management of CGF; she effectively acted as the director of CGF. As said, Dr. Walton did not perform these tasks. She was the "face" of CGF, together with Dr. Walton, because of her active role at fundraisers and personal relationships with members of the foundation. The PSR also makes clear that she was "very visible and took an active role in certain fundraising events by selling tickets, playing host during the events and performing a meet and greet." She also acted as the "point person" for the CGF annual charity golf tournament, working closely with a sports celebrity. This "very visible" role she played over a number of years was not that of a person performing ordinary clerical duties.

She did not merely accept monies raised by the foundation and act as the keeper of the accounts and books. There is evidence she was engaged with persons who did fundraising activities for CGF and then stole the money they had raised. She was installed in a position in which she developed significant relationships with the families and was the point of contact for fundraising events. For example, a former CGF board member and parent of two patients testified that it was Sicher who gave her two daughters, then 11 and 13 years old, wrist bands to sell in their neighborhood in

Connecticut as a fundraising effort. The girls went door-to-door, raising $300 in cash, which they gave to the defendant in a plastic bag. The defendant then took the money.

Moreover, in at least one instance Sicher was engaged with a family having a fundraising event about which Dr. Walton knew nothing. A former CGF board member testified that she had held a fundraising birthday party for CGF at her house, working with Sicher, who never told Dr. Walton about the event. Sicher received the money from the event but pocketed it for herself. The district court was certainly rational in not inferring that money raising drives originated and were managed sua sponte without any involvement by a representative of the charity.

B.       Sicher's Thefts

In these two roles, in which Sicher admittedly received minimal supervision, the defendant was able to steal from both Dr. Walton and CGF.

1.       Thefts from Dr. Walton's Practice

Beginning no later than September 2000, the defendant began to steal from Dr. Walton's medical practice. She stole reimbursement checks sent to Dr. Walton from public and private health insurance programs for medical services by indorsing them with the forged signature of Dr. Walton and depositing them into her personal bank account. She took patient payments made by check to Dr. Walton as well as patient co-payments made in cash. She

told one patient he owed an additional $1000 not covered by the insurance payment received and then, when the patient paid, pocketed the money. Dr. Walton did not monitor Sicher's representations to patients about the sums owed or himself review the deposits to see that the accounts were correct.

Over the course of five years of thefts from Dr. Walton's practice, Sicher stole more than 160 checks from more than 40 different insurers, totaling over $150,000. To carry out her thefts, the defendant made, without Dr. Walton's authorization or knowledge, a signature stamp, which she used to forge Dr. Walton's signature in indorsing the checks. Dr. Walton did not review the checks, and so did not observe this. The defendant also deleted various records of the surgeries Dr. Walton had performed for which payments were still due from the practice's computer files.

2.   Thefts from CGF

Sicher was also able to use her position to encourage fundraising for CGF, to steal from CGF's bank account, and to steal funds meant to be deposited to the accounts. She took blank, unsigned checks for CGF, which were intended for funding research grants and for which Dr. Walton was the sole authorized signatory. Sicher made 61 of those checks payable to herself from CGF and deposited them into her personal bank account, taking a total of $172,995 from the CGF account. She also stole at least seven donations made by check from third parties for a total of $9,850.

She used the signature stamp she had made of Dr. Walton's signature to indorse the checks in order to carry out these thefts. She also took cash donations made to CGF, which the defendant told the government totaled approximately $10,170. These actions were admittedly taken without the authorization of Dr. Walton. They were also taken without his knowledge or permission. But it is not the formal job description which is at issue but the actual responsibilities of her job.

Sicher was able to conceal these actions because of the scope of her duties. For example, she, not Dr. Walton, was responsible for opening and reviewing CGF's monthly bank statements, and presumably reconciling accounts. For at least five years, she showed Dr. Walton only the first page of the statements which show the balance for the CGF account. She destroyed the remaining pages that showed the cleared, forged checks. Dr. Walton deferred to Sicher's representations about the finances of both his practice and CGF after seeing only the first page of the bank statements and did not conduct a supervisory review of her accounting.

Sicher was given increased responsibilities over the years because, Dr. Walton said, he trusted her and had confidence in her. His office essentially had no checks and balances on the discretion she had in both of her roles.

C.        Dr. Walton's Discovery of Sicher's Thefts

In November 2005, Dr. Walton discovered the first evidence of Sicher's thefts totally by chance. He was in the office on a Saturday and received and opened the office mail, which included a bank statement showing that a $25,000 check from CGF to a University of Georgia professor had been returned for insufficient funds. Dr. Walton knew that there should have been enough money in the CGF account for the check to clear; also he had been surprised not to have received an acknowledgment of the check from the professor. When Dr. Walton asked Sicher about the check, she stated that the check had been sent and that the professor had called to thank Dr. Walton. Dr. Walton then confronted Sicher about the check discrepancy, and she admitted to stealing $4,000 from the CGF account. Investigation established that the defendant had stolen at least $350,000.

D.        District Court Proceedings

On January 16, 2007, defendant pled guilty to the 26-count information.

The pre-sentence report ("PSR") submitted to the district court calculated an offense level of 22 under the Guidelines. The PSR recommended a two-level enhancement for abuse of a position of trust, U.S.S.G. § 3B1.3, a two-level enhancement for a misrepresentation that the defendant was acting on behalf of a charitable organization, U.S.S.G. § 2B1.1, and a three-level

downward adjustment for acceptance of responsibility, U.S.S.G. § 3E1.1.  Sicher's criminal history was calculated at Category I.

The PSR's recommendation that the abuse of trust enhancement should be applied was based on the discretion the defendant exercised in administering the medical practice and in managing CGF's activities.  The relevant facts included: that the defendant had an "extremely high level of trust based upon her ten-year professional relationship with Dr. Walton"; that she "was given substantial professional discretion to manage the financial and administrative functions of the office"; that Dr. Walton "gave the defendant considerable deference and relied upon her to conduct his daily affairs"; that Sicher "regularly attended and hosted fundraisers by the CGF" and was the "face" of CGF along with Dr. Walton; and that she had strong personal relationships with patients and families "who visited [Dr. Walton's] office in hopes of finding a cure."  The PSR concluded that "the defendant was insulated from scrutiny, which contributed significantly to her ability to facilitate the theft and conceal it on an ongoing basis thereafter."  Defendant filed an objection to the PSR's conclusion that the enhancement applied, but did not dispute the underlying factual assertions.[3]

---

[3] Defendant argued that she was "a secretary who worked without any clerical support and who was poorly and loosely supervised" and therefore did not occupy a position of trust.  She further argued that her "ability to accomplish the thefts [was not] facilitated by the nature of the position she held."  The defendant

-11-

Sicher chose not to present any contrary facts with respect to her role at CGF and the medical practice to the district court. She only submitted evidence regarding her mental health disorders. In the mental health evidence, she told Dr. Reade, who evaluated her, that she "knew what records Dr. Walton scrutinized and which he ignored." Sicher knew precisely how to take advantage of the discretion and minimal supervision she received.

During the pre-sentence hearing on July 12, 2007, defendant again objected that she did not hold a position of trust. Importantly, Sicher conceded that in fact she was not supervised. She attempted to blame Dr. Walton for this, saying he was too busy and should have hired more staff.

Before hearing the witnesses at the sentencing hearing, on August 2, 2007, the district court stated it had given considerable time and thought to what the sentences would be.[4]

---

objected that "[i]n the ordinary course in a well-run medical office, her position is not one in which the employee enjoys great discretion and 'significantly less supervision' than the usual clerical worker."

The Probation Officer responded to the objection, stating that as Dr. Walton's sole employee, Sicher "was given substantial professional discretion to manage the financial and administrative functions of the office and the foundation." Her claims that she was poorly supervised or that Dr. Walton's office was poorly run were "unfounded." The Probation Officer maintained the recommendation that the enhancement applied based on the evidence of Sicher's discretionary responsibilities and the trust that Dr. Walton and the patients had placed in her.

[4] The district court declined to impose the enhancement for misrepresentation that she was acting on behalf of a charitable organization.

During the sentencing hearing and before defense counsel argued, defense counsel asked the judge how he had resolved the disputed Guidelines issue, as it would affect her argument. The court responded that "I find that the defendant did violate a position of trust." Defense counsel did not ask for a greater explanation, nor did defense counsel present any evidence or any oral argument at the sentencing hearing that the position Sicher held was not a position of trust.

The district court found that both Dr. Walton and CGF were victims. The court heard statements from Dr. Walton as well as four current and former CGF board members, all of whom had children who were patients of Dr. Walton, and all of whom described their views that she was trusted by them, and that they took actions in reliance on that trust, and she had abused the trust. Sicher did not testify.

At sentencing, the district court also rejected defendant's requested a downward departure or variance based on the evidence she had submitted of her mental health conditions and announced the 36-month sentence.

Defendant now appeals her sentence.

## II.

Sicher's first argument is that the district court erred in applying the enhancement for abuse of a position of trust under U.S.S.G. § 3B1.3 because she did not hold a position of trust.

Defendant contends that on the factual record presented in the district court, there was insufficient evidence for the court to conclude that defendant exercised the kind of "substantial professional or managerial discretion" necessary to support the enhancement.[5] We disagree. The government's burden is to show the facts supporting the enhancement by a preponderance of the evidence. United States v. Connell, 960 F.2d 191, 197 (1st Cir. 1992).

Our caselaw has reviewed the propriety of a § 3B1.3 enhancement under different standards. See United States v. Gonzalez-Alvarez, 277 F.3d 73, 81 (1st Cir. 2002) (giving due deference to the district court's application of § 3B1.3 to the facts). In other cases, we have described the standard of review as de novo. United States v. O'Connell, 252 F.3d 524, 528 (1st Cir. 2001); see also United States v. Parrilla Roman, 485 F.3d 185, 190 (1st Cir. 2007). To the extent that determination depends upon findings of fact, we review the district court's factual determinations for clear error. O'Connell, 252 F.3d at 528. These determinations may be made by drawing reasonable inferences from the evidence. Marceau, 554 F.3d at 32.

---

    [5] Defendant argues, citing United States v. Garrison, 133 F.3d 831, 838 (11th Cir. 1998), that there must be a fiduciary or fiduciary-like relationship between the defendant and victim of the defendant's fraud. This is not the law of our circuit, and we reject the argument.

Certainly, questions about interpretation of a guideline are reviewed de novo. Marceau, 554 F.3d at 29. Questions of application of a guideline tend more to be on a sliding scale.[6] For the present case, it makes no difference. Even if our review were purely de novo, we would affirm.

---

[6] While we have used the language of "de novo" review to apply to a trial judge's legal conclusion from the facts, we think this is more like a mixed question of law and fact, with a sliding scale of review depending on whether the trial judge's conclusion is more law-oriented or more fact-driven. Recently the D.C. Circuit, recognizing that it had used different standards of review, stated that "insofar as the district court applied the 'abuse of trust' Guideline to the facts of [the defendant's] case, due deference is the appropriate standard of review." United States v. Tann, 532 F.3d 868, 875 n.**** (D.C. Cir. 2008).

Several circuits state that they review the application of the Guidelines de novo and the district court's factual findings for clear error. United States v. Spear, 491 F.3d 1150, 1153 (10th Cir. 2007); United States v. Andrews, 484 F.3d 476, 478 (7th Cir. 2007); United States v. Brave Thunder, 445 F.3d 1062 (8th Cir. 2006); United States v. Ebersole, 411 F.3d 517, 535-36 (4th Cir. 2005); United States v. Britt, 388 F.3d 1369, 1371 (11th Cir. 2004) (per curiam), vacated on other grounds, 546 U.S. 930 (2005); see also United States v. Brogan, 238 F.3d 780, 783 (6th Cir. 2001) (reviewing de novo decision of a district court to apply § 3B1.3)

Other circuits have framed the standard of review somewhat differently. See United States v. Dullum, 560 F.3d 133, 140 (3d Cir. 2009) (district court's determination that defendant occupied a position of trust reviewed de novo; the court's determination that defendant abused that position in a manner that significantly facilitated the offense is a question of fact reviewed for clear error); United States v. Hirsch, 239 F.3d 221, 227 (2d Cir. 2001) (same); see also United States v. Ollison, 555 F.3d 152, 164 (5th Cir. 2009) ("The application of . . . § 3B1.3 is a sophisticated factual determination reviewed under the clearly erroneous standard." (quoting United States v. Fisher, 7 F.3d 69, 70-71 (5th Cir. 1993))); cf. United States v. Thornton, 511 F.3d 1221, 1227 n.4 (9th Cir. 2008) ("Before Booker, we reviewed the application of the abuse of trust enhancement -- a mixed question of law and fact -- de novo . . . Although the same standard of review may well apply after Booker, we need not decide the issue." (citation omitted)).

To apply the enhancement, "the district court must first decide that the defendant occupied a position of trust and then find that [she] used that position to facilitate or conceal the offense." United States v. Gill, 99 F.3d 484, 489 (1st Cir. 1996). These steps are distinct. Parrilla Roman, 485 F.3d at 191.

The district court did not specify the precise basis for the application of the enhancement, nor did it need to do so. "[W]e note once more that 'a [sentencing] court's reasoning can often be inferred by comparing what was argued by the parties or contained in the pre-sentence report with what the judge did." United States v. Hoey, 508 F.3d 687, 694 (1st. Cir. 2007) (quoting United States v. Jiménez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006) (en banc)). Indeed, in Rita v. United States, 551 U.S. 338, 359 (2007), the Supreme Court affirmed where there was cursory reasoning by the trial judge, on the basis of inferences as to the sentencing judge's likely reasoning where "context and the record make clear that this, or similar, reasoning underlies the judge's conclusion."

In reviewing the district court's conclusion, we review all of the information before the court. That evidence must be viewed as a whole and not atomized. United States v. Hilario-Hilario, 529 F.3d 65, 78-79 (1st Cir. 2008) (examining district court evidence including the PSR to evaluate whether the § 3B1.3 sentencing enhancement applied). Special weight is given to those

-16-

portions of the PSR to which no countervailing proof is offered. United States v. Prochner, 417 F.3d 54, 66 (1st Cir. 2005) ("The defendant may object to facts in the PSR, but 'if [his] objections to the PSR are merely rhetorical and unsupported by countervailing proof, the district court is entitled to rely on the facts in the PSR.'" (alteration in original) (quoting United States v. Cyr, 337 F.3d 96, 100 (1st Cir. 2003))).

A. Guidelines Requirement

We begin with whether the government has shown by a preponderance of the evidence that Sicher occupied a position of trust. The Guideline states: "If the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." U.S.S.G. § 3B1.3. Commentary illuminates the meaning of the Guidelines. The commentary states that a "position of public or private trust" is "characterized by professional or managerial discretion." U.S.S.G. § 3B1.3 cmt. n.1. "Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." Id. The Guidelines commentary further explains that the enhancement would apply to "a bank executive's fraudulent loan scheme," but does "not apply in the case of an embezzlement or theft by an ordinary bank teller or

hotel clerk" because such positions lack the required discretion.[7]
Id. The plain language of the Guideline thus covers a spectrum of positions. At one end, the enhancement applies to a supervisor to whom substantial discretion is delegated; at the other end, an ordinary bank teller with no discretion is excluded.

In evaluating the first step of the § 3B1.3 enhancement analysis, "the relevant inquiry . . . is whether a person in fact occupied a position of trust, rather than whether the person's title or official job description contained a discretionary element." United States v. Chanthaseng, 274 F.3d 586, 589 (1st Cir. 2001) (emphasis in original); see also United States v. Allen, 201 F.3d 163, 166 (2d Cir. 2000) ("An employee need not have a fancy title or be a 'big shot' in an organization to qualify for an enhancement for abuse of a position of trust."); United States v. Barrett, 178 F.3d 643, 646 (2d Cir. 1999) (noting that § 3B1.3 enhancement has been applied to police officers, security guards, babysitters, custodians, and truck drivers). The fact that Sicher's title was only that of secretary and administrative assistant is beside the point.

---

[7] The application note to § 3B1.3 was amended in 1993 to emphasize managerial or professional discretion and minimal supervision. See Parrilla Roman, 485 F.3d at 191; United States v. Reccko, 151 F.3d 29, 33 (1st Cir. 1998). There is no dispute that we are dealing with the post-1993 version of the Guideline and we consider relevant cases applying the Guideline with the amended application note.

Under our precedent, the district court's implicit conclusion that Sicher held a position of trust characterized by managerial discretion cannot be reversed. The record shows that Sicher, through her roles in the medical practice and at CGF, in fact exercised a great deal of discretion and had little supervision. These roles must be considered together for purposes of the enhancement. What is conclusive for us is her role in CGF.

Were the enhancement based on Sicher's secretarial role in Dr. Walton's medical practice alone, this might be considered a more difficult issue. Cf. United States v. Tann, 532 F.3d 868, 874-76 (D.C. Cir. 2008) (no enhancement where office manager's responsibilities limited to payroll and entering checks into ledger). Whether Sicher's secretarial role alone in the medical practice is enough to support the enhancement is a question we do not need to reach. In light of the additional role Sicher performed at CGF, the evidence firmly supports the district court's conclusion that she occupied a position of trust.

The record is clear that Sicher in fact exercised considerable authority and discretion as to CGF; this is necessarily so, as she was unsupervised in a number of tasks as to receipt and disbursement of funds. First, Sicher opened and reviewed CGF's monthly bank statements and then selectively gave information to Dr. Walton, who was only shown the bottom line of the account (i.e. only the first page, which only showed the total

account balance).  Indeed, she exercised autonomy over incoming donations, the payments of grants to researchers (as evidenced by the non-payment to one researcher), and maintenance of the accounting logs.  She was essentially unsupervised by Dr. Walton as to these responsibilities and has never claimed otherwise.

Second, as the public face of CGF, she was entrusted to host CGF fundraisers and to take steps to facilitate the fundraisers such as dealing with celebrities and distributing items for sale.  She also exercised discretion as to what fundraisers would be held in CGF's name, not even disclosing them to Dr. Walton.  Regardless of the defendant's title, she essentially took over as the de facto manager and director of CGF.

Where a supervisor fails to review the financial transactions carried out by an employee, as here, effectively giving the employee significant discretion, we have held that the enhancement applies.  Chanthaseng, 274 F.3d at 590 ("Although it was against bank regulations for appellant to countersign rapid deposit tickets at will, the bank manager's laxity effectively made that a central element of [defendant's] position.").

Other courts have applied the enhancement to employees who, despite their title, were in fact entrusted with substantial discretion.  For example, in United States v. Laljie, 184 F.3d 180, 195-96 (2d Cir. 1999), the Second Circuit upheld an abuse of trust enhancement for a personal secretary who altered checks made

payable to cash and tricked her employer into signing checks made payable to her personal accounts. There, the court explained that "the proper characterization of the secretarial position for [§ 3B1.3] purpose[s] will depend" on the responsibilities the employer delegates to the employee and the discretion the employer confers. Id. at 195; see also United States v. Tiojanco, 286 F.3d 1019, 1021-22 (7th Cir. 2002) (enhancement applies to hotel clerk in accounts receivable department who was responsible for handling telephone calls from hotel guests who disputed charges made to their credit card account).

We recognize that testimony by individuals that they trusted someone who betrayed their trust does not itself establish that the position was a position of trust. The testimony, however, is not irrelevant. With growing trust by the employer and/or victim, an employee may be in fact given increasing levels of responsibility and discretion over time which such that the position becomes one "characterized by professional or managerial discretion" without any change in title. That is true here. Our caselaw recognizes this as grounds to sustain a § 3B1.3 enhancement. In United States v. O'Connell, this court concluded that the closeness of the relationship between the defendant and the victim supported the district court's finding that the defendant occupied a position of trust. O'Connell applied the enhancement to a bookkeeper who had forged the business owner's

name to the checks. 252 F.3d at 528-29. In upholding the enhancement, O'Connell stated that "mere[] access to the [business's] checkbook and accounting software" was insufficient to trigger the application of the enhancement. Id. Rather, "two other aspects of O'Connell's employment . . . enabled his thefts: O'Connell's authority to transfer funds from the line of credit to the checking account and his close, personal relationship with the [business owners]." Id. at 529. This is a very different point than saying no more than the defendant lacked supervision.

The testimony at Sicher's sentencing hearing repeatedly emphasized the high level of trust Dr. Walton and others had in the defendant, which resulted in her having an even more important role in CGF.[8]

Although Sicher is correct to argue that "trust" has a "special meaning" under the Guidelines, United States v. Reccko, 151 F.3d 29, 31 (1st Cir. 1998), it is also evident from the testimony that the particular level of trust Dr. Walton and the patients and families had in Sicher "result[ed] in less supervision of and more autonomy" for her. O'Connell, 252 F.3d at 529. And whatever the reason Sicher was given such a significant role, she was in fact in a position of trust as defined in the Guideline.

---

[8] Sicher was particularly close to the patients and trusted by them. For example, the secretary of the CGF board described how the defendant "latched onto us when we were perhaps the most vulnerable we've ever been." Sicher was described as "accepted as a member of [the CGF board's] family" and would call his wife six times a day.

The cases upon which Sicher relies to argue that she does not occupy a position of trust, Reccko and Parrilla Roman, are easily distinguished. In Reccko, this court rejected the application of the enhancement to a police station receptionist/switchboard operator who possessed "no discernable discretion." Reccko, 151 F.3d at 32. There, the defendant was closely supervised; her telephone lines were "continuously" monitored; and although she announced visitors, "she did not have discretion either to screen them or to admit them to the non-public areas of the stationhouse." Id. In Parrilla Roman, 485 F.3d at 192, we rejected an enhancement for airport baggage handlers where there was no evidence of discretion or that defendants "toiled under minimal supervision." Sicher did not have a "menial position," id., on par with the closely supervised receptionist/switchboard operator or baggage handler.

As to the second step, the record clearly shows that defendant used her position of trust to conceal her offenses.[9] There is no dispute that Sicher was able to carry out her offenses for at least five years by showing Dr. Walton only the first page of the monthly bank statements and deleting the remaining pages showing her illegal activity. The trusted, familial role that defendant held in Dr. Walton's practice and CGF facilitated the

---

[9]     On appeal defendant does not contest that her position enabled her to conceal her offense.

thefts.  In addition, she used her vast array of responsibilities with CGF to perform and to conceal her thefts from the foundation.

Finally, we reject Sicher's second claim of error that the district court failed to consider and to grant a downward variance on the basis of evidence of her mental health problems, including diagnoses of borderline personality disorder, major depression, and compulsive gambling disorder.

The record demonstrates that the district court in fact did consider the defendant's mental health evidence, but simply did not find it persuasive.  The district court stated, "Frankly, while I understand that, I regard it as an explanation rather than a justification . . . . Not the kind of mental state to excuse this criminal behavior."  Further, the district court did recommend that defendant receive mental health treatment in prison.  The record thus refutes defendant's second claim of error.

### III.

The sentence is <u>affirmed</u>.


**-Dissenting Opinion Follows-**

**LIPEZ**, **Circuit Judge**, dissenting. The majority opinion is a curious blend of intimations and unjustified inferences. With its invocation of our authority to infer the reasoning of the able and experienced district court judge, who said that he "had given considerable time and thought to what the sentences would be," the majority intimates that we should defer to the decision of the judge even in the absence of any explanation of his decision that appellant occupied a position of trust within the meaning of the guidelines. With its repeated invocation of the conclusory assertion of the PSR that Sicher exercised managerial discretion in carrying out her work for the CGF, an essential characteristic of a position of trust, the majority intimates that there is evidence in the record to support that assertion. Yet when the majority tries to identify specific instances of the exercise of such discretion, there is only an empty record. Therefore, I respectfully dissent.

In Part I of the dissent, I set forth the law that applies to the position of trust enhancement. In Part II, I apply the law to the facts of this case, first addressing appellant's work as a secretary for Dr. Walton's medical office and then her work for the Children's Glaucoma Foundation ("CGF"). Although the majority chooses not to discuss appellant's work as secretary to the medical office, I must do so because of my view that the position of trust enhancement was improperly applied. In my

discussion of the application of the law to Sicher's work with the CGF, I focus on the errors in the majority's analysis.[10]

## I.

United States Sentencing Guidelines section 3B1.3 calls for a two-level upward adjustment when "the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense."  The application notes to this provision explain that a position of public or private trust refers to one "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)."  U.S.S.G. § 3B1.3 cmt. n.1.  The notes further explain that:

> Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.  For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult).  This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination.

---

[10] I concur with the majority's rejection of appellant's claim that the district court failed to consider the evidence about her mental health.

> This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

Id.

We require sentencing courts to conduct a two-step inquiry to determine whether the section 3B1.3 enhancement applies to a particular defendant. See United States v. Reccko, 151 F.3d 29, 31 (1st Cir. 1998). First, a court must determine whether a defendant occupied a "position of trust" within the meaning of the guideline. We have called this the "status question." United States v. Parilla-Román, 485 F.3d 185, 190-91 (1st Cir. 2007). If the defendant's job does not meet that description, the inquiry ends and the enhancement does not apply. If, however, a court answers the status question affirmatively, it should proceed to the second step of the inquiry and ask whether the defendant used her position of trust to facilitate or conceal her offense. Reccko, 151 F.3d at 31; Parilla-Román, 485 F.3d at 190. It is error to conflate these two steps by determining that a defendant "held a position of trust precisely because her job enabled her to commit the crime." Reccko, 151 F.3d at 32; see also Parilla-Román, 485 F.3d at 191 ("[I]t does not follow that, merely because a defendant's position enables him to commit an offense, the position must have been unsupervised and, thus, a position of trust.").

With respect to the status inquiry, our cases -- and the guideline itself -- reveal that the requirement of managerial or professional discretion is "paramount." United States v. Chanthaseng, 274 F.3d 586, 589 (1st Cir. 2001). Labels do not matter; it is the defendant's actual degree of discretion, not his or her job title, that controls the applicability of section 3B1.3. United States v. Gill, 99 F.3d 484, 489 (1st Cir. 1996). Although positions of trust exist in many different settings, they all involve:

> . . . situation-specific decisionmaking that is given considerable deference precisely because it cannot be dictated entirely by established protocol. All of these individuals are charged with exercising their judgment in the best interest of another person or entity; this is the essence of the "professional or managerial discretion" to which the guideline refers.

United States v. Tiojanco, 286 F.3d 1019, 1021 (7th Cir. 2002)[11]; see also id. at 1020-21 (describing "positions of trust" as falling into two categories: 1) "people like doctors, lawyers, and investment advisors who have (or hold themselves out as having specialized expertise that leaves the average layman ill-equipped to monitor their job performance," and 2) employees in organizational settings who are charged with "deciding, on a case-by-case basis, whether a particular expenditure or transfer of

---

[11] The full quotation from this decision refers to "complex, situation-specific decisionmaking." Id. at 1021 (emphasis added). I think that the use of the adjective "complex" overstates this otherwise useful proposition.

-28-

company funds or other valuables is necessary or beneficial to the organization").

This focus on the presence of managerial or professional discretion is necessarily fact-intensive, and the fact patterns will vary widely from case to case. Nevertheless, our precedent provides useful guidance. For example, in Chanthaseng, 274 F.3d at 589-90, we found that a mid-level bank manager occupied a position of trust when she stole from the bank through a scheme of making false "rapid deposit" tickets for fictional large cash deposits. The defendant's supervisor gave her the authority (against corporate rules) to countersign her own deposit tickets and failed to review her tickets, "essentially making her the branch's sole decision-maker for those transactions." Id. at 589. The same supervisor had also asked the defendant to look into an odd entry in the bank's records -- one which the defendant in fact created to conceal her theft -- without providing any oversight for the defendant's subsequent investigation. Id. at 590.

We also found the position of trust enhancement applicable in United States v. O'Connell, 252 F.3d 524, 528-29 (1st Cir. 2001), where the defendant was an office manager with access to an $850,000 line of credit that he could use to transfer funds into his employer's checking account. We concluded that "the authority to draw off the account suggests significant managerial discretion." Id.

-29-

By contrast, we were not able to identify the presence of professional or managerial discretion in other cases. In Reccko, 151 F.3d at 30-32, we found that the section 3B1.3 enhancement was inappropriately applied to a police station receptionist and switchboard operator who was closely supervised and whose phone calls were monitored, even though her position made her privy to secret police information that she used to tip a friend to a planned drug bust. Although the defendant's job at the station "afforded her access to information," it "reposed in her no discernable discretion." Id. at 32.

We also rejected the application of the enhancement in Parilla-Román, 485 F.3d at 191, where we found that defendants had not occupied positions of trust as baggage handlers for an airline even though they had received special security clearance in connection with their employment. We noted that the defendants' positions did not afford them discretion. Id. As our cases demonstrate, mere access to finances, secure space, or secret information does not amount to a position of trust unless the access is accompanied by the exercise of professional or managerial discretion.

Distinguishing positions with managerial authority from those without it can be difficult in the office setting, where employees often have a wide range of duties that must be scrutinized carefully to determine if they truly encompass managerial

discretion.  The difficult line-drawing that may be necessary in the office setting is illustrated by United States v. Tann, 532 F.3d 868 (D.C. Cir. 2008).  The defendant there was an office manager who was convicted of fraud for embezzling from three successive employers.  Id. at 870.  Her duties over the course of the three jobs included ordering equipment, scheduling travel, maintaining a check ledger (she was not authorized to sign checks), ensuring that monthly bank statements matched the ledger, making out payroll checks, handling cost records, and preparing checks to be signed by her supervisors.  Id. at 870-71.  Although the district court had found that Tann was "trusted to handle the finances of the organization[s]," it failed to identify any specific tasks requiring managerial discretion.  Id. at 875 (modification in original) (internal quotation marks and citation omitted).  In the absence of proof of such tasks, the enhancement was not applicable.[12]  Id.

In United States v. Edwards, 325 F.3d 1184, 1185-86 (10th Cir. 2003), the enhancement did not apply to an administrative assistant who handled accounts receivable, received customer checks in the

---

[12] I note that some of Tann's responsibilities -- such as hiring employees and managing expenditures, id. at 870-71, -- might amount to managerial discretion under some circumstances.  Such tasks are not at issue in this case, and I therefore need not decide whether they would reflect "managerial discretion" in the context of appellant's job.  Nonetheless, managing expenditures might well amount to "managerial discretion" of the kind contemplated by the guideline, and I am uneasy with Tann to the extent that it concludes otherwise.

mail and prepared them for deposit, calculated the balance of customer accounts, posted payments to customer accounts, and prepared cash receipts reports that were incorporated into the company's ledgers and financial statements. The Tenth Circuit stated that "the adjustment under § 3B1.3 is not intended to be routinely applied to every employee fraud or embezzlement case. . . . [T]he fact is that in every successful fraud the defendant will have created confidence and trust in the victim, but the sentencing enhancement is not intended to apply to every case of fraud." Id. at 1187 (internal quotation marks and citation omitted). Because Edwards's job "was purely ministerial and did not entail substantial discretionary judgment," the section 3B1.3 enhancement was inappropriate. Id.

## II.

In imposing the abuse of trust enhancement in this case, the district court made no factual findings on the record concerning the nature of appellant's position and whether it required the exercise of professional or managerial discretion. The court had before it, however, the charging document to which appellant pled guilty, victim impact letters written by Dr. Walton on behalf of himself and the CGF, the victim impact testimony of Dr. Walton and parents of some of his patients, appellant's psychiatric and compulsive gambling evaluations and, most importantly, the PSR. Appellant did not contest the objective facts set forth in any of

-32-

these sources.  The district court was entitled to accept those uncontested facts as true.  <u>United States</u> v. <u>Prochner</u>, 417 F.3d 54, 66 (1st Cir. 2005).

In contrast to the objective facts (which include, for example, the specific tasks Sicher performed, the descriptions of events occurring during the course of her fraud, and the amount of money she stole), appellant did contest a critical conclusion drawn from those facts that would, if true, support the imposition of the position of trust enhancement.  Namely, she contested the PSR's assertion that she "was given substantial professional discretion to manage the financial and administrative functions of the office," arguing in her sentencing memorandum that her job "was not one that was 'characterized by professional or managerial discretion.'"  Defendant's Sentencing Memorandum at 2 (quoting U.S.S.G. § 3B1.3).  Unlike the majority, I do not merely accept the PSR's conclusion that appellant was given substantial discretion, or the district court's unexplained finding that "the defendant did violate a position of trust."  The district court made no subsidiary findings of fact about whether appellant's position afforded her managerial discretion.  "In a case such as this one, in which the district court announced its decision to adjust upward without any subsidiary findings of fact, we 'review the evidence and the result, [but] not the reasoning by which the result was reached by the district court.'"  <u>Chanthaseng</u>, 274 F.3d

-33-

at 589 (quoting United States v. Tracy, 36 F.3d 199, 203 (1st Cir. 1994)).

The majority invokes the ability of the district court to make factual determinations by drawing reasonable inferences from the evidence, and our ability to infer a sentencing court's reasoning under certain circumstances. Those propositions, while unquestionably correct, are irrelevant to this case. Whatever the intricacies of the review process here,[13] my conclusion is that any inferences fairly drawn from the record simply do not support the conclusion that appellant occupied a position of trust.

**A. Administrative Assistant to Dr. Walton's Medical Office**

The PSR states that Dr. Walton relied on appellant to "conduct his daily affairs," giving her "substantial professional discretion to manage the financial and administrative functions of the office." These generalities, repeated by the government in its brief, draw no support from the specific responsibilities attributed to Sicher. Her specific duties, as set forth in the PSR, included ministerial tasks such as opening mail, welcoming patients, scheduling appointments, bookkeeping, and collecting and depositing payments. These kinds of ministerial tasks do not normally require "substantial discretionary judgment that is ordinarily given

---

[13] I do agree with the majority's suggestion in footnote 6 of its opinion that our review of the imposition of the position of trust enhancement ordinarily involves a "mixed question of law and fact, with a sliding scale of review depending on whether the trial judge's conclusion is more law-oriented or more fact-driven."

considerable deference," U.S.S.G. § 3B1.3 cmt. n.1, and the record gives us no reason to conclude that they did in this situation. Notably, the record does not reveal that appellant had authority to make spending decisions for the medical office, prepare a budget, approve or deny spending requests, or conduct any other discretionary task with respect to the "financial and administrative functions of the office." While is true that appellant's responsibilities gave her the opportunity to commit her crimes, they "reposed in her no discernable discretion." Reccko, 151 F.3d at 32; see also United States v. Spear, 491 F.3d 1150, 1154 (10th Cir. 2007) ("'The fact that [the defendant] was trusted by her employer with significant responsibility . . . is not determinative.'" (alterations in original) (quoting Edwards, 325 F.3d at 1187)).

## B. Administrative Assistant to the Children's Glaucoma Foundation

The following two paragraphs are the core of the majority's erroneous reasoning about the significance of appellant's work for the CGF:

> The record is clear that Sicher in fact exercised considerable authority and discretion as to CGF; this is necessarily so, as she was unsupervised in a number of tasks as to receipt and disbursement of funds. First, Sicher opened and reviewed CGF's monthly bank statements and then selectively gave information to Dr. Walton, who was only shown the bottom line of the account (i.e. only the first page, which only showed the total account balance). Indeed, she exercised autonomy over incoming donations, the payments of grants to researchers (as evidenced by the non-payment to one researcher), and maintenance of the accounting logs. She was essentially unsupervised by Dr. Walton as to these responsibilities and has never claimed otherwise.

-35-

Second, as the public face of CGF, she was entrusted to host CGF fundraisers and to take steps to facilitate the fundraisers such as dealing with celebrities and distributing items for sale. She also exercised discretion as to what fundraisers would be held in CGF's name, not even disclosing them to Dr. Walton. Regardless of the defendant's title, she essentially took over as the de facto manager and director of CGF.

These paragraphs contain both factual and legal errors. I will deal with the factual errors first, setting forth the assertions at issue in bold print.

1. Factual Errors

a. **"Sicher opened and reviewed CGF's monthly bank statements and then selectively gave information to Dr. Walton, who was only shown the bottom line of the account (i.e. only the first page, which only showed the total account balance)."**

This statement only describes the technique of Sicher's crime; her concealment of illicit transactions does not show that she was authorized to exercise managerial discretion on behalf of the CGF. While Sicher, as a bookkeeper, may have been the only one to review the itemized record of the bank account's activity, that fact does not indicate that she was authorized to exercise discretion over the transactions reported there.

b. **Sicher "exercised autonomy over incoming donations . . . ."**

Sicher "exercised autonomy" over incoming donations only to the extent that she was the sole person responsible for depositing them in the CGF's bank account.[14] She exercised no authority over the

---

[14] The majority cites <u>Chanthaseng</u>, 274 F.3d at 590, for the proposition that "when a supervisor fails to review the financial

-36-

funds in that account, however, because she was not permitted to choose where they should be deposited or how they should be spent. She had no authority to write checks from the CGF's bank account.[15]

>    c. **Sicher "exercised autonomy over . . . the payments of grants to researchers."**

If this statement were true -- for example, if Sicher had the authority to decide which researchers were to be paid, how much, or even when -- that fact would indeed support the majority's position that she exercised discretion in her role. However, there is no evidence to support that proposition. Certainly, the episode on which the majority relies to make the assertion (when Dr. Walton discovered appellant's thefts because a check to a researcher was

---

transactions carried out by an employee, as here, effectively giving the employee significant discretion, we have held that the enhancement applies." The facts of that case, however, are quite different. The defendant in Chanthaseng became the "sole decision-maker" for certain financial transactions. Id. at 589. By contrast, appellant was not authorized to make any decisions about financial transactions for the CGF and the medical office. She was not authorized to write checks, manage, or move money; she was only authorized to deposit it in a specified account. As with the case of an embezzling bank teller, the fact that she did otherwise does not make hers a position of trust.

[15] The PSR explains:

> The CGF had a supply of blank, unsigned checks at Dr. Walton's office, which were drawn off of the CGF account and intended primarily for use in funding research grants. During all relevant periods, Dr. Walton was the named trustee and sole authorized signatory on the CGF bank account. He neither delegated signature authority to Sicher, nor authorized, directed, or otherwise suggested that Sicher obtain a signature stamp with his name.

returned for insufficient funds) does not support the contention. Dr. Walton discovered the theft when, to his surprise, he saw that the check to the researcher had bounced; he knew that there should have been enough money in the account to cover it. That episode only supports the conclusion that Sicher, without the authorization or knowledge of Dr. Walton, drained the account of money. It cannot support the inference that Sicher had "complete autonomy" over research grant payments. While she might possibly have prepared the check to the researcher (a fact the record does not provide), she was, without question, unauthorized to sign it on her own.

> d. **Sicher "exercised autonomy over . . . maintenance of the accounting logs."**

This statement is probably true. Sicher was the bookkeeper for the CGF as well as the medical office. As we indicated in O'Connell, 252 F.3d at 528-29, however, that ministerial task does not indicate the use of discretionary judgment. See id. (noting that "[t]here is some support for O'Connell's argument that his position as a bookkeeper . . . did not place him within the Guideline definition of a position of a trust," but finding support for the imposition of the enhancement in other aspects of the defendant's job).

e. **"[A]s the public face of CGF, [Sicher] was entrusted to host CGF fundraisers and to take steps to facilitate the fundraisers such as dealing with celebrities and distributing items for sale."**

Sicher was a "host" of CGF events only in the sense that she was a greeter and a "face" of the charity. The record shows that she was called on to use her social skills on behalf of the organization, not her managerial discretion. For example, the majority focuses on an episode, described at sentencing by the mother of a patient, when Sicher gave wristbands to two girls who sold them to raise money for the charity. The disbursement of a fundraising item, and the subsequent theft of the money raised, does not reflect the use, especially not the authorized use, of managerial discretion. Nothing in the record indicates that Sicher planned, designed, or developed the bracelet fundraiser.

f. **Sicher "also exercised discretion as to what fundraisers would be held in CGF's name, not even disclosing them to Dr. Walton."**

Nowhere does the record support the contention that Sicher exercised discretion about what fundraisers would be held. The majority apparently draws this conclusion from the testimony about a birthday party held by a former member of the CGF's Board of Directors, who said at sentencing:

> [M]y husband and I had a birthday party in our home and every guest there donated money to the foundation, directly to the foundation. But, Dr. Walton never heard of this. Because, the defendant decided rather than to give this money to research and to study, she would put it in her own pocket. She would steal from my children, from all of these children.

This testimony describes Sicher's use of the birthday party to steal money, not her exercise of discretion in planning and implementing the party. Nor does the testimony support the more general conclusion that anything about Sicher's position -- explicitly or implicitly -- gave her authority to use discretion about what fundraisers to hold.

g. **"Regardless of defendant's title, she essentially acted as the director of the CGF."**

As I have indicated, the facts belie this wishful characterization. Strikingly, Sicher was paid only an additional $150 per month for her work on behalf of the CGF. That modest increment is not surprising. Contrary to the majority's suggestions, the record does not indicate that appellant made any decisions on behalf of the CGF, such as determining how to fundraise, setting financial goals, or choosing how to spend its money. She did not have authority to write checks, prepare the budget, or supervise employees. Appellant's position at the CGF afforded her access to the funds she ultimately stole, but it did not require the exercise of managerial discretion.

2. Legal Errors

The majority's opinion attempts to draw too certain a connection between the lack of supervision and the exercise of discretion. The government makes the same error in its brief, suggesting that the section 3B1.3 enhancement was appropriate because of Sicher's lack of supervision and her close relationship

-40-

with Dr. Walton and the families who visited his office. It is true that lack of supervision often characterizes positions that require the exercise of managerial discretion. The guideline commentary makes that very point: "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3 cmt. n.1. It does not follow from that observation, however, that lack of supervision of an employee means that the employee is necessarily authorized or expected to exercise professional or managerial discretion. In some circumstances, the ministerial nature of the task may not justify much supervision. Although the guideline requires the exercise of managerial or professional discretion to apply the enhancement, it only suggests that lack of supervision is one way to detect whether that discretion exists. The majority asserts the opposite, concluding that Sicher "in fact exercised considerable authority and discretion as to CGF; this is necessarily so, as she was unsupervised in a number of tasks as to receipt and disbursement of funds."

Likewise, the majority makes the error of equating simple trust with a section 3B1.3 "position of trust," a link long rejected by this circuit. See Reccko, 151 F.3d at 31. The majority states that, "[w]ith growing trust by an employer, and/or victim, an employee may be in fact given increasing levels of responsibility and discretion over time [] such that the position becomes one

-41-

'characterized by professional or managerial discretion' without any change in title.'" That observation may be apt in some circumstances, but the record does not support it here. Sicher had access to the finances of the CGF and the medical office because she was trusted, but she was not permitted to exercise her discretion over those finances.[16]

The majority also embraces the government's argument that our decision in O'Connell, 252 F.3d 524, supports its contention that Sicher's close relationships with Dr. Walton and the families of his patients transformed her role into a "position of trust" within the meaning of section 3B1.3. The majority describes O'Connell as holding that "the closeness of the relationship between the defendant and the victim supported the district court's finding that the defendant occupied a position of trust." While that is true, our decision in that case critically depended on the trusted relationship in combination with the defendant's "unfettered access to an $850,000 line of credit" which he had "authority to transfer

---

[16] The Second Circuit has more recently relied on the proposition that "applicability of a § 3B1.3 enhancement turns on 'the extent to which the position provides the freedom to commit a difficult-to-detect wrong.'" United States v. Allen, 201 F.3d 163, 166 (2d Cir. 2000) (quoting United States v. Viola, 35 F.3d 37, 45 (2d Cir. 1994); see also United States v. Laljie, 184 F.3d 180, 195-96 (2d Cir. 1999). We have explicitly rejected that proposition. See Parilla-Román, 485 F.3d at 191; Reccko, 151 F.3d at 33 ("It is true that in dealing with the position-of-trust enhancement courts occasionally have emphasized the employee's freedom to commit wrongs that defy facile detection. But these decisions deal with earlier versions of § 3B1.3 and, thus, antedate the Sentencing Commission's emphasis on managerial or professional discretion . . . .").

. . . to the checking account."  Id. at 529.  We stated that "the authority to draw off the account suggests significant managerial discretion," a conclusion that was bolstered by the district court's finding that the defendant had a close personal relationship that led to "more autonomy for O'Connell."  Id.  We can accept that Sicher's close, trusted relationships with Dr. Walton and the families of his patients were comparable to the family-like relationship of O'Connell with his employer, and that this closeness gave Sicher access to money that she could embezzle.  However, unlike O'Connell, appellant had no ability to exercise decision-making authority in her position as administrative assistant to the CGF.[17]

## III.

There is no question that appellant committed a terrible "betrayal of trust" within the colloquial understanding of that phrase.  Dr. Walton trusted her to deposit income into the medical office's account, and his young patients and their families trusted that the CGF would benefit from the donations they gave to her for safekeeping and deposit.  At sentencing, Dr. Walton and parents of

---

[17] Importantly, we remarked in O'Connell that, taken alone, O'Connell's lack of legal signatory authority on the company's checking account, and the fact that he clearly exceeded his authority by writing checks to himself, would have suggested "that it was not professional discretion that facilitated the commission of O'Connell's crimes, but merely his access to the [company] checkbook."  252 F.3d at 528.  In this sense, Sicher's situation is comparable to O'Connell's: she had access to the office and CGF checking accounts, but no signatory authority on either account.

his patients described the detrimental effect of appellant's betrayal on their ability to trust others. The district court described her breach of trust as "egregious" and "an amazing violation of trust," and I agree.

"The sentencing guidelines, however, create their own vocabulary -- and the guidelines sometimes define terms in ways that might strike lay persons as peculiar. So it is here: in the idiom of the sentencing guidelines, the term 'position of public or private trust' has a special meaning." Reccko, 151 F.3d at 31. As the application notes explain, the position-of-trust enhancement applies only to those positions "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3 cmt. n.1. Even accepting all of the objective facts set forth in the PSR and elsewhere in the record as true (as the district court was entitled to do in the absence of any challenge to them), the facts are insufficient to support the imposition of the position of trust enhancement because they do not indicate that appellant had a position that afforded her discretion. If one looks beyond the PSR's conclusory assertion that appellant had discretion "to run the financial and administrative affairs of the office," and the district court's unexplained application of the position of trust enhancement, the record does not reveal any tasks requiring the exercise of judgment and the decisionmaking authority that are the

essence of managerial discretion within the meaning of the guideline. See Tiojanco, 286 F.3d at 1021. Instead, one finds only ministerial tasks and the exercise of social skills.

Unfortunately, in an effort to affirm the district court, the majority has significantly diluted the guidelines' concept of professional and managerial discretion. Moreover, contrary to our precedent, the majority comes perilously close to equating lack of supervision with the exercise of discretion. Thus, the majority's conclusion that the application of the position of trust enhancement was proper in this case represents a sharp departure from our precedent and the once coherent body of law that applied to this issue. I respectfully dissent.