LYNCH, Chief Judge.
This sentencing appeal primarily raises the question of what evidence is sufficient to establish that the defendant held a position of trust for purposes of U.S.S.G. § 3B1.3 to support the imposition of a sentencing enhancement.
Defendant Karen Sicher, who was the sole employee of a surgeon and the charitable foundation for children’s medical care he started, pled guilty to ten counts of uttering forged securities, in violation of 18 U.S.C. § 513, ten counts of health care program theft, in violation of 18 U.S.C. § 669, and six counts of income tax evasion, in violation of 26 U.S.C. § 7201. The district court imposed a sentence of 36 months’ imprisonment on each count to be served concurrently, followed by 36 months of supervised release, and restitution in the amount of $334,639.
Sicher challenges her sentence on two grounds. First, she contends that the district erred in imposing a two-level sentencing enhancement for abuse of a position of trust, U.S.S.G. § 3B1.3. That enhancement increased her Guidelines sentencing range from 24 to 30 months to 30 to 37 months. Second, she argues the district court failed to consider evidence of her mental health, which she claims merits a downward variance. Finding no error, we affirm.
I.
The following evidence was part of the record before the district court at sentencing. The district court at sentencing is entitled to draw “fair inference[s],” United States v. Tejada-Beltran, 50 F.3d 105, 113 (1st Cir.1995), from the evidence before it.[1] United States v. Marceau, 554 *66 F.3d, 24 (1st Cir.2009) (“A sentencing court is entitled to rely on circumstantial evidence and draw plausible inferences therefrom.” (internal citations omitted)).
For ten years, Sicher worked as an administrative assistant and secretary to Dr. David S. Walton, a surgeon in ophthalmology specializing in children’s glaucoma, a leading cause of blindness for infants and toddlers. Dr. Walton was a “busy and focused surgeon” who had a heavy load of clinical duties and significant teaching responsibilities at Harvard Medical School, where he was a Professor of Ophthalmology. He spent long hours tending to his medical responsibilities.[2]
Dr. Walton relied heavily upon the defendant, his sole employee and “trusted representative,” to run his medical office while he focused on these other demands. Indeed, Sicher perceived herself as having essential managerial responsibilities. She told the government in interviews that she took care of Dr. Walton on a day-to-day basis and that, for example, Dr. Walton did not know how to use an ATM. Utilizing her position as his assistant, Sicher stole at least $150,000 from payments to his medical practice.
In addition, Sicher played a second role which is particularly significant to the question of whether the enhancement was correctly applied. For seven of those ten years, for an additional monthly payment, she also handled all administrative tasks for the Children’s Glaucoma Foundation (“CGF”). CGF was a non-profit organized by Dr. Walton initially and dedicated to supporting programs for children’s glaucoma sufferers. The organization raises money and provides grants in support of programs to increase awareness of children’s glaucoma, two university based research studies on childhood glaucoma, and support of physician training in the care of affected children. The record before us does not show how many funds were raised for CGF, but the records show Sicher stole approximately $193,000 of those funds. Many families whose children were treated by Dr. Walton also devoted their financial and personal energies to supporting CGF.
The foundation had only two functions: fundraising and distributing the funds it raised through grants. Only two people were involved in the day-to-day management of CGF: Dr. Walton and Sicher. As said, Dr. Walton spent almost all of his time and energies in providing medical treatment to his patients, as well as fulfilling his academic and teaching responsibilities. This meant that the other responsibilities for CGF, particularly the management of fundraisers, fell largely on Sicher.
A. Sicher’s Dual Job Responsibilities
Hired in 1995, Sicher was Dr. Walton’s sole employee and was responsible for managing his medical practice. Her job responsibilities in Dr. Walton’s practice included welcoming patients, scheduling appointments, doing the bookkeeping, accepting and depositing co-payments and medical reimbursement checks, and reeeiv *67 ing the practice’s bank account statements. While he was busy providing medical services, Dr. Walton relied on the defendant, his “trusted representative in the office environment,” to manage all the financial and administrative functions of the office. Through her position, she became personally close with many of the families of Dr. Walton’s patients.
In 1998, upon the founding of CGF, Dr. Walton asked Sicher to take on all administrative responsibilities for CGF. Her formal duties included accepting and depositing donations for CGF, informing Dr. Walton of any donations, and opening and reviewing CGF’s monthly bank statements. In practice, Sicher’s activities went well beyond her formal duties. Her duties were essential to the management of CGF; she effectively acted as the director of CGF. As said, Dr. Walton did not perform these tasks. She was the “face” of CGF, together with Dr. Walton, because of her active role at fundraisers and personal relationships with members of the foundation. The PSR also makes clear that she was “very visible and took an active role in certain fundraising events by selling tickets, playing host during the events and performing a meet and greet.” She also acted as the “point person” for the CGF annual charity golf tournament, working closely with a sports celebrity. This “very visible” role she played over a number of years was not that of a person performing ordinary clerical duties.
She did not merely accept monies raised by the foundation and act as the keeper of the accounts and books. There is evidence she was engaged with persons who did fundraising activities for CGF and then stole the money they had raised. She was installed in a position in which she developed significant relationships with the families and was the point of contact for fund-raising events. For example, a former CGF board member and parent of two patients testified that it was Sicher who gave her two daughters, then 11 and 13 years old, wrist bands to sell in their neighborhood in Connecticut as a fundraising effort. The girls went door-to-door, raising $300 in cash, which they gave to the defendant in a plastic bag. The defendant then took the money.
Moreover, in at least one instance Sicher was engaged with a family having a fund-raising event about which Dr. Walton knew nothing. A former CGF board member testified that she had held a fund-raising birthday party for CGF at her house, working with Sicher, who never told Dr. Walton about the event. Sicher received the money from the event but pocketed it for herself. The district court was certainly rational in not inferring that money raising drives originated and were managed sua sponte without any involvement by a representative of the charity.
B. Sicher’s Thefts
In these two roles, in which Sicher admittedly received minimal supervision, the defendant was able to steal from both Dr. Walton and CGF.
1. Thefts from Dr. Walton’s Practice
Beginning no later than September 2000, the defendant began to steal from Dr. Walton’s medical practice. She stole reimbursement checks sent to Dr. Walton from public and private health insurance programs for medical services by indorsing them with the forged signature of Dr. Walton and depositing them into her personal bank account. She took patient payments made by check to Dr. Walton as well as patient co-payments made in cash. She told one patient he owed an additional $1000 not covered by the insurance payment received and then, when the patient paid, pocketed the money. Dr. Walton did *68 not monitor Sicher’s representations to patients about the sums owed or himself review the deposits to see that the accounts were correct.
Over the course of five years of thefts from Dr. Walton’s practice, Sicher stole more than 160 checks from more than 40 different insurers, totaling over $150,000. To carry out her thefts, the defendant made, without Dr. Walton’s authorization or knowledge, a signature stamp, which she used to forge Dr. Walton’s signature in indorsing the checks. Dr. Walton did not review the checks, and so did not observe this. The defendant also deleted various records of the surgeries Dr. Walton had performed for which payments were still due from the practice’s computer files.
2. Thefts from CGF
Sicher was also able to use her position to encourage fundraising for CGF, to steal from CGF’s bank account, and to steal funds meant to be deposited to the accounts. She took blank, unsigned checks for CGF, which were intended for funding research grants and for which Dr. Walton was the sole authorized signatory. Sicher made 61 of those checks payable to herself from CGF and deposited them into her personal bank account, taking a total of $172,995 from the CGF account. She also stole at least seven donations made by check from third parties for a total of $9,850. She used the signature stamp she had made of Dr. Walton’s signature to indorse the checks in order to carry out these thefts. She also took cash donations made to CGF, which the defendant told the government totaled approximately $10,170. These actions were admittedly taken without the authorization of Dr. Walton. They were also taken without his knowledge or permission. But it is not the formal job description which is at issue but the actual responsibilities of her job.
Sicher was able to conceal these actions because of the scope of her duties. For example, she, not Dr. Walton, was responsible for opening and reviewing CGF’s monthly bank statements, and presumably reconciling accounts. For at least five years, she showed Dr. Walton only the first page of the statements which show the balance for the CGF account. She destroyed the remaining pages that showed the cleared, forged checks. Dr. Walton deferred to Sicher’s representations about the finances of both his practice and CGF after seeing only the first page of the bank statements and did not conduct a supervisory review of her accounting.
Sicher was given increased responsibilities over the years because, Dr. Walton said, he trusted her and had confidence in her. His office essentially had no checks and balances on the discretion she had in both of her roles.
C. Dr. Walton’s Discovery of Sicher’s Thefts
In November 2005, Dr. Walton discovered the first evidence of Sicher’s thefts totally by chance. He was in the office on a Saturday and received and opened the office mail, which included a bank statement showing that a $25,000 check from CGF to a University of Georgia professor had been returned for insufficient funds. Dr. Walton knew that there should have been enough money in the CGF account for the check to clear; also he had been surprised not to have received an acknowledgment of the check from the professor. When Dr. Walton asked Sicher about the check, she stated that the check had been sent and that the professor had called to thank Dr. Walton. Dr. Walton then confronted Sicher about the check discrepancy, and she admitted to stealing $4,000 from the CGF account. Investigation es *69 tablished that the defendant had stolen at least $350,000.
D. District Court Proceedings
On January 16, 2007, defendant pled guilty to the 26-count information.
The pre-sentence report (“PSR”) submitted to the district court calculated an offense level of 22 under the Guidelines. The PSR recommended a two-level enhancement for abuse of a position of trust, U.S.S.G. § 3B1.3, a two-level enhancement for a misrepresentation that the defendant was acting on behalf of a charitable organization, U.S.S.G. § 2B1.1, and a three-level downward adjustment for acceptance of responsibility, U.S.S.G. § 3E1.1. Sicher’s criminal history was calculated at Category I.
The PSR’s recommendation that the abuse of trust enhancement should be applied was based on the discretion the defendant exercised in administering the medical practice and in managing CGF’s activities. The relevant facts included: that the defendant had an “extremely high level of trust based upon her ten-year professional relationship with Dr. Walton”; that she “was given substantial professional discretion to manage the financial and administrative functions of the office”; that Dr. Walton “gave the defendant considerable deference and relied upon her to conduct his daily affairs”; that Sicher “regularly attended and hosted fundraisers by the CGF” and was the “face” of CGF along with Dr. Walton; and that she had strong personal relationships with patients and families “who visited [Dr. Walton’s] office in hopes of finding a cure.” The PSR concluded that “the defendant was insulated from scrutiny, which contributed significantly to her ability to facilitate the theft and conceal it on an ongoing basis thereafter.” Defendant filed an objection to the PSR’s conclusion that the enhancement applied, but did not dispute the underlying factual assertions.[3]
Sicher chose not to present any contrary facts with respect to her role at CGF and the medical practice to the district court. She only submitted evidence regarding her mental health disorders. In the mental health evidence, she told Dr. Reade, who evaluated her, that she “knew what records Dr. Walton scrutinized and which he ignored.” Sicher knew precisely how to take advantage of the discretion and minimal supervision she received.
During the pre-sentence hearing on July 12, 2007, defendant again objected that she did not hold a position of trust. Importantly, Sicher conceded that in fact she was not supervised. She attempted to blame Dr. Walton for this, saying .he was too busy and should have hired more staff.
Before hearing the witnesses at the sentencing hearing, on August 2, 2007, the district court stated it had given considera *70 ble time and thought to what the sentences would be.[4] During the sentencing hearing and before defense counsel argued, defense counsel asked the judge how he had resolved the disputed Guidelines issue, as it would affect her argument. The court responded that “I find that the defendant did violate a position of trust.” Defense counsel did not ask for a greater explanation, nor did defense counsel present any evidence or any oral argument at the sentencing hearing that the position Sicher held was not a position of trust.
The district court found that both Dr. Walton and CGF-were victims. The court heard statements from Dr. Walton as well as four current and former CGF board members, all of whom had children who were patients of Dr. Walton, and all of whom described their views that she was trusted by them, and that they took actions in reliance on that trust, and she had abused the trust. Sicher did not testify.
At sentencing, the district court also rejected defendant’s requested downward departure or variance based on the evidence she had submitted of her mental health conditions and announced the 36-month sentence.
Defendant now appeals her sentence.
II.
Sicher’s first argument is that the district court erred in applying the enhancement for abuse of a position of trust under U.S.S.G. § 3B1.3 because she did not hold a position of trust. Defendant contends that on the factual record presented in the district court, there was insufficient evidence for the court to conclude that defendant exercised the kind of “substantial professional or managerial discretion” necessary to support the enhancement.[5] We disagree. The government’s burden is to show the facts supporting the enhancement by a preponderance of the evidence. United States v. Connell, 960 F.2d 191, 197 (1st Cir.1992).
Our caselaw has reviewed the propriety of a § 3B 1.3 enhancement under different standards. See United States v. Gonzalez-Alvarez, 277 F.3d 73, 81 (1st Cir.2002) (giving due deference to the district court’s application of § 3B1.3 to the facts). In other cases, we have described the standard of review as de novo. United States v. O’Connell, 252 F.3d 524, 528 (1st Cir.2001); see also United States v. Parrilla Roman, 485 F.3d 185, 190 (1st Cir.2007). To the extent that determination depends upon findings of fact, we review the district court’s factual determinations for clear error. O’Connell, 252 F.3d at 528. These determinations may be made by drawing reasonable inferences from the evidence. Marceau, 554 F.3d at 32.
Certainly, questions about interpretation of a guideline are reviewed de novo. Marceau, 554 F.3d at 29. Questions of application of a guideline tend more to be on a sliding scale.[6] For the present case, *71 it makes no difference. Even if our review were purely de novo, we would affirm.
To apply the enhancement, “the district court must first decide that the defendant occupied a position of trust and then find that [she] used that position to facilitate or conceal the offense.” United States v. Gill, 99 F.3d 484, 489 (1st Cir. 1996). These steps are distinct. Parrilla Roman, 485 F.3d at 191.
The district court did not specify the precise basis for the application of the enhancement, nor did it need to do so. “[W]e note once more that ‘a [sentencing] court’s reasoning can often be inferred by comparing what was argued by the parties or contained in the pre-sentence report with what the judge did.” United States v. Hoey, 508 F.3d 687, 694 (1st. Cir.2007) (quoting United States v. Jiménez-Beltre, 440 F.3d 514, 519 (1st Cir.2006) (en banc)). Indeed, in Rita v. United States, 551 U.S. 338, 359, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007), the Supreme Court affirmed where there was cursory reasoning by the trial judge, on the basis of inferences as to the sentencing judge’s likely reasoning where “context and the record make clear that this, or similar, reasoning underlies the judge’s conclusion.”
In reviewing the district court’s conclusion, we review all of the information before the court. That evidence must be viewed as a whole and not atomized. United States v. Hilario-Hilario, 529 F.3d 65, 78-79 (1st Cir.2008) (examining district court evidence including the PSR to evaluate whether the § 3B1.3 sentencing enhancement applied). Special weight is given to those portions of the PSR to which no countervailing proof is offered. United States v. Prochner, 417 F.3d 54, 66 (1st Cir.2005) (“The defendant may object to facts in the PSR, but ‘if [his] objections to the PSR are merely rhetorical and unsupported by countervailing proof, the district court is entitled to rely on the facts in the PSR.’ ” (alteration in original) (quoting United States v. Cyr, 337 F.3d 96, 100 (1st Cir.2003))).
A. Guidelines Requirement
We begin with whether the government has shown by a preponderance of the *72 evidence that Sicher occupied a position of trust. The Guideline states: “If the defendant abused a position of public or private trust ... in a manner that significantly-facilitated the commission or concealment of the offense, increase by 2 levels.” U.S.S.G. § 3B1.3. Commentary illuminates the meaning of the Guidelines. The commentary states that a “position of public or private trust” is “characterized by professional or managerial discretion.” U.S.S.G. § 3B1.3 cmt. n. 1. “Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.” Id. The Guidelines commentary further explains that the enhancement would apply to “a bank executive’s fraudulent loan scheme,” but does “not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk” because such positions lack the required discretion.[7] Id. The plain language of the Guideline thus covers a spectrum of positions. At one end, the enhancement applies to a supervisor to whom substantial discretion is delegated; at the other end, an ordinary bank teller with no discretion is excluded.
In evaluating the first step of the § 3B1.3 enhancement analysis, “the relevant inquiry ... is whether a person in fact occupied a position of trust, rather than whether the person’s title or official job description contained a discretionary element.” United States v. Chanthaseng, 274 F.3d 586, 589 (1st Cir.2001) (emphasis in original); see also United States v. Allen, 201 F.3d 163, 166 (2d Cir.2000) (“An employee need not have a fancy title or be a ‘big shot’ in an organization to qualify for an enhancement for abuse of a position of trust.”); United States v. Barrett, 178 F.3d 643, 646 (2d Cir.1999) (noting that § 3B1.3 enhancement has been applied to police officers, security guards, babysitters, custodians, and truck drivers). The fact that Sicher’s title was only that of secretary and administrative assistant is beside the point.
Under our precedent, the district court’s implicit conclusion that Sicher held a position of trust characterized by managerial discretion cannot be reversed. The record shows that Sicher, through her roles in the medical practice and at CGF, in fact exercised a great deal of discretion and had little supervision. These roles must be considered together for purposes of the enhancement. What is conclusive for us is her role in CGF.
Were the enhancement based on Sicher’s secretarial role in Dr. Walton’s medical practice alone, this might be considered a more difficult issue. Cf. United States v. Tann, 532 F.3d 868, 874-76 (D.C.Cir.2008) (no enhancement where office manager’s responsibilities limited to payroll and entering checks into ledger). Whether Sicher’s secretarial role alone in the medical practice is enough to support the enhancement is a question we do not need to reach. In light of the additional role Sicher performed at CGF, the evidence firmly supports the district court’s conclusion that she occupied a position of trust.
The record is clear that Sicher in fact exercised considerable authority and discretion as to CGF; this is necessarily so, as she was unsupervised in a number of tasks as to receipt and disbursement of funds. First, Sicher opened and reviewed *73 CGF’s monthly bank statements and then selectively gave information to Dr. Walton, who was only shown the bottom line of the account (i.e. only the first page, which only showed the total account balance). Indeed, she exercised autonomy over incoming donations, the payments of grants to researchers (as evidenced by the non-payment to one researcher), and maintenance of the accounting logs. She was essentially unsupervised by Dr. Walton as to these responsibilities and has never claimed otherwise.
Second, as the public face of CGF, she was entrusted to host CGF fundraisers and to take steps to facilitate the fundraisers such as dealing with celebrities and distributing items for sale. She also exercised discretion as to what fundraisers would be held in CGF’s name, not even disclosing them to Dr. Walton. Regardless of the defendant’s title, she essentially took over as the de facto manager and director of CGF.
Where a supervisor fails to review the financial transactions carried out by an employee, as here, effectively giving the employee significant discretion, we have held that the enhancement applies. Chanthaseng, 274 F.3d at 590 (“Although it was against bank regulations for appellant to countersign rapid deposit tickets at will, the bank manager’s laxity effectively made that a central element of [defendant’s] position.”).
Other courts have applied the enhancement to employees who, despite their title, were in fact entrusted with substantial discretion. For example, in United States v. Laljie, 184 F.3d 180, 195-96 (2d Cir.1999), the Second Circuit upheld an abuse of trust enhancement for a personal secretary who altered checks made payable to cash and tricked her employer into signing checks made payable to her personal accounts. There, the court explained that “the proper characterization of the secretarial position for [§ 3B1.3] purposed] will depend” on the responsibilities the employer delegates to the employee and the discretion the employer confers. Id. at 195; see also United States v. Tiojanco, 286 F.3d 1019, 1021-22 (7th Cir.2002) (enhancement applies to hotel clerk in accounts receivable department who was responsible for handling telephone calls from hotel guests who disputed charges made to their credit card account).
We recognize that testimony by individuals that they trusted someone who betrayed their trust does not itself establish that the position was a position of trust. The testimony, however, is not irrelevant. With growing trust by the employer and/or victim, an employee may be in fact given increasing levels of responsibility and discretion over time such that the position becomes one “characterized by professional or managerial discretion” without any change in title. That is true here. Our caselaw recognizes this as grounds to sustain a § 3B1.3 enhancement. In United States v. O’Connell, this court concluded that the closeness of the relationship between the defendant and the victim supported the district court’s finding that the defendant occupied a position of trust. O’Connell applied the enhancement to a bookkeeper who had forged the business owner’s name to the checks. 252 F.3d at 528-29. In upholding the enhancement, O’Connell stated that “mere[] access to the [business’s] checkbook and accounting software” was insufficient to trigger the application of the enhancement. Id. Rather, “two other aspects of O’Connell’s employment ... enabled his thefts: O’Connell’s authority to transfer funds from the line of credit to the checking account and his close, personal relationship with the [business owners].” Id. at 529. This is a very different *74 point than saying no more than the defendant lacked supervision.
The testimony at Sicher’s sentencing hearing repeatedly emphasized the high level of trust Dr. Walton and others had in the defendant, which resulted in her having an even more important role in CGF.[8]
Although Sicher is correct to argue that “trust” has a “special meaning” under the Guidelines, United States v. Reccko, 151 F.3d 29, 31 (1st Cir.1998), it is also evident from the testimony that the particular level of trust Dr. Walton and the patients and families had in Sicher “result[ed] in less supervision of and more autonomy” for her. O’Connell, 252 F.3d at 529. And whatever the reason Sicher was given such a significant role, she was in fact in a position of trust as defined in the Guideline. .
The cases upon which Sicher relies to argue that she does not occupy a position of trust, Reccko and Parrilla Roman, are easily distinguished. In Reccko, this court rejected the application of the enhancement to a police station receptionist/switchboard operator who possessed “no discernable discretion.” Reccko, 151 F.3d at 32. There, the defendant was closely supervised; her telephone lines were “continuously” monitored; and although she announced visitors, “she did not have discretion either to screen them or to admit them to the non-public areas of the stationhouse.” Id. In Parrilla Roman, 485 F.3d at 192, we rejected an enhancement for airport baggage handlers where there was no evidence of discretion or that defendants “toiled under minimal supervision.” Sicher did not have a “menial position,” id., on par with the closely supervised receptionist/switchboard operator or baggage handler.
As to the second step, the record clearly shows that defendant used her position of trust to conceal her offenses.[9] There is no dispute that Sicher was able to carry out her offenses for at least five years by showing Dr. Walton only the first page of the monthly bank statements and deleting the remaining pages showing her illegal activity. The trusted, familial role that defendant held in Dr. Walton’s practice and CGF facilitated the thefts. In addition, she used her vast array of responsibilities with CGF to perform and to conceal her thefts from the foundation.
Finally, we reject Sicher’s second claim of error that the district court failed to consider and to grant a downward variance on the basis of evidence of her mental health problems, including diagnoses of borderline personality disorder, major depression, and compulsive gambling disorder.
The record demonstrates that the district court in fact did consider the defendant’s mental health evidence, but simply did not find it persuasive. The district court stated, “Frankly, while I understand that, I regard it as an explanation rather than a justification.... Not the kind of mental state to excuse this criminal behavior.” Further, the district court did recommend that defendant receive mental health treatment in prison. The record thus refutes defendant’s second claim of error.
*75 ill.
The sentence is affirmed.
—Dissenting Opinion Follows—

. The court is not restricted to drawing only those inferences compelled by the evidence. See United States v. Olivero, 552 F.3d 34, 38-39 (1st Cir.2009) (“If the facts plausibly sup *66 port competing inferences, as here, a sentencing court cannot clearly err in choosing one.”).

. Dr. Walton’s testimony was that the practice was a "special place” in a unique environment that focused on particularly "complex and difficult patients.” While ophthalmologists ordinarily see 50 to 60 patients a day, Dr. Walton saw five to six patients on a busy day, spending considerable time with each. This close-knit medical practice had a small roster of patients whom Dr. Walton treated more intensively. Patients began seeing Dr. Walton as newborns, and he continued treating them through their teenage years.

. Defendant argued that she was "a secretary who worked without any clerical support and who was poorly and loosely supervised” and therefore did not occupy a position of trust. She further argued that her “ability to accomplish the thefts [was not] facilitated by the nature of the position she held.” The defendant objected that "[i]n the ordinary course in a well-run medical office, her position is not one in which the employee enjoys great discretion and 'significantly less supervision' than the usual clerical worker.”
The Probation Officer responded to the objection, slating that as Dr. Walton's sole employee, Sicher "was given substantial professional discretion to manage the financial and administrative functions of the office and the foundation.” Her claims that she was poorly supervised or that Dr. Walton's office was poorly run were "unfounded.” The Probation Officer maintained the recommendation that the enhancement applied based on the evidence of Sicher's discretionary responsibilities and the trust that Dr. Walton and the patients had placed in her.

. The district court declined to impose the enhancement for misrepresentation that she was acting on behalf of a charitable organization.

. Defendant argues, citing United States v. Garrison, 133 F.3d 831, 838 (11th Cir.1998), that there must be a fiduciary or fiduciary-like relationship between the defendant and victim of the defendant’s fraud. This is not the law of our circuit, and we reject the argument.

. While we have used the language of "de novo” review to apply to a trial judge's legal conclusion from the facts, we think this is more like a mixed question of law and fact, with a sliding scale of review depending on whether the trial judge’s conclusion is more law-oriented or more fact-driven. Recently the D.C. Circuit, recognizing (hat it had used *71 different standards of review, stated that "insofar as the district court applied the 'abuse of trust’ Guideline to the facts of [the defendant’s] case, due deference is the appropriate standard of review.” United States v. Tann, 532 F.3d 868, 875 n. * * * * (D.C.Cir.2008).
Several circuits state that they review the application of the Guidelines de novo and the district court’s factual findings for clear error. United States v. Spear, 491 F.3d 1150, 1153 (10th Cir.2007); United States v. Andrews, 484 F.3d 476, 478 (7th Cir.2007); United States v. Brave Thunder, 445 F.3d 1062 (8th Cir.2006); United States v. Ebersole, 411 F.3d 517, 535-36 (4th Cir.2005); United States v. Britt, 388 F.3d 1369, 1371 (11th Cir.2004) (per curiam), vacated on other grounds, 546 U.S. 930, 126 S.Ct. 411, 163 L.Ed.2d 313 (2005); see also United States v. Brogan, 238 F.3d 780, 783 (6th Cir.2001) (reviewing de novo decision of a district court to apply § 3B1.3)
Other circuits have framed the standard of review somewhat differently. See United States v. Dullum, 560 F.3d 133, 140 (3d Cir.2009) (district court’s determination that defendant occupied a position of trust reviewed de novo; the court’s determination that defendant abused that position in a manner that significantly facilitated the offense is a question of fact reviewed for clear error); United States v. Hirsch, 239 F.3d 221, 227 (2d Cir.2001) (same); see also United States v. Ollison, 555 F.3d 152, 164 (5th Cir.2009) ("The application of ... § 3B 1.3 is a sophisticated factual determination reviewed under the clearly erroneous standard.” (quoting United States v. Fisher, 7 F.3d 69, 70-71 (5th Cir.1993))); cf. United States v. Thornton, 511 F.3d 1221, 1227 n. 4 (9th Cir.2008) ("Before Booker, we reviewed the application of the abuse of trust enhancement — a mixed question of law and fact — de novo ... Although the same standard of review may well apply after Booker, we need not decide the issue.” (citation omitted)).

. The application note to § 3B1.3 was amended in 1993 to emphasize managerial or professional discretion and minimal supervision. See Parrilla Roman, 485 F.3d at 191; United States v. Reccko, 151 F.3d 29, 33 (1st Cir.1998). There is no dispute that we are dealing with the post-1993 version of the Guideline and we consider relevant cases applying the Guideline with the amended application note.

. Sicher was particularly close to the patients and trusted by them. For example, the secretary of the CGF board described how the defendant “latched onto us when we were perhaps the most vulnerable we've ever been.” Sicher was described as "accepted as a member of [the CGF board’s] family” and would call his wife six times a day.

. On appeal defendant does not contest that her position enabled her to conceal her offense.