# United States Court of Appeals
## For the First Circuit

No. 11-1974

UNITED STATES,

Appellee,

v.

DAWN ZEHRUNG,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Howard, Stahl, and Thompson,
Circuit Judges.

Alexandra Deal, with whom Stern, Shapiro, Weissberg & Garin, LLP, was on brief, for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom Thomas E. Delahanty II, United States Attorney, was on brief, for appellee.

April 18, 2013

**THOMPSON, Circuit Judge**.  Dawn Zehrung appeals her 37-month sentence after pleading guilty to violating the federal healthcare-fraud statute, 18 U.S.C. § 1347.  She raises one issue: Should the district judge have enhanced her sentence under U.S.S.G. § 3B1.3 for abusing a position of trust?[1]  In what follows, we explain why a remand for supplemental fact finding is required.

Because there was no trial, we draw the facts primarily from the presentence report and from the sentencing-hearing transcript and submissions.  See, e.g., United States v. Anonymous Defendant, 629 F.3d 68, 71 (1st Cir. 2010).  Zehrung worked in a doctor's office in Maine, first as a billing clerk and then as a billing manager (these are descriptive labels rather than formal titles, apparently).  Her former boss, Robert Grover, D.O., and former colleague, Renee Harding, R.N., sketched out the office's billing procedure this way:  After a patient's visit, either Dr. Grover or a nurse would take a document called a "super bill" and circle an alphanumeric code to indicate the service provided.  Zehrung would get the super bill, enter the code into a software program, and, with a click of the button, generate a bill that she would then send to payers like MaineCare, Medicare, and Anthem.

---

[1] The judge sentenced her in August 2011, so we, like the judge, use the 2010 version of the sentencing guidelines.  See United States v. Rodriguez, 630 F.3d 39, 42 (1st Cir. 2010) (explaining which version of the guidelines customarily controls and why).

Entering the codes was pretty easy. "[I]t's a fairly simple system," Nurse Harding said.

When Zehrung first came on board, an office manager watched what she did, comparing what she had inputted into the system with what was on the super bill, for example. Eventually, though, the office manager left and was not replaced, so Zehrung got to run the billing process on her own. Not only that, according to Dr. Grover, she got unsupervised control over the practice's checkbook and accounts payable, too. She also had access to the office's "cashbox," which contained the copayments from patients. "[S]he was the financial person," Dr. Grover stressed, which freed him up to care for his 14,000 patients.

Everything seemed to be going swimmingly with Zehrung at the financial helm. Monthly revenues shot up a whopping 33%. An obviously ecstatic Dr. Grover asked her what was going on, and she said she had been "going through the old accounts, working the accounts." For a while, that explanation worked, though Dr. Grover also knew that part of the reason why revenues had jumped was because his office had started doing some aesthetics procedures, like laser hair removal.

Of course appearances can be deceiving, and that was the case here. You see, Zehrung had been carrying out an "upcode" scam on the sly – i.e., bilking money out of MaineCare and the other payers by changing the codes to overstate what services had been

provided and thus fetch higher payments.  And she profited from the con, because she got paid bonuses based on the practice's increased revenues.  Bad enough, but she also had been submitting bills for services not rendered and destroying super bills to cover her tracks.  Also, she ended up with other bonuses that were not "authorize[d]."[2]

Zehrung's crooked scheme began to unravel when a nurse spotted the billing "problem" and went straight to Dr. Grover. "Dawn, how do you explain this?" he asked Zehrung.  Hoping to talk her way out of a trip to the police station, Zehrung floated two theories:  first, that a computer glitch had caused the upcoding; and second, that she had been billing "what should have been done" – whatever that means.  Dr. Grover bought none of it, and all of this led to Zehrung's arrest and guilty-plea conviction for healthcare fraud.

Which brings us to sentencing.  There the parties sparred over whether Zehrung should get a § 3B1.3 adjustment – one that is appropriate if she used a position of trust in such a way that made the crime easier to carry out or cover up.  They did, however, agree that the government had the burden of proving the enhancement by the preponderance of the evidence, see United States v. Sicher, 576 F.3d 64, 70 (1st Cir. 2009), which is a more-likely-than-not

_____

[2] Just how she got these bonuses – whether she paid them to herself with checks from the practice's account, for example – is unclear on this record.

standard, <u>see</u> <u>United States</u> v. <u>Morgan</u>, 384 F.3d 1, 5 (1st Cir. 2004).

Consistent with this guideline, we ask sentencing judges faced with this type of issue to follow a two-step process. First they must see if the defendant held a position of trust. And, if the answer is yes, then (and only then) they must see if the defendant used that position in some significant way to facilitate or conceal the offense. <u>See</u> <u>United States</u> v. <u>Parrilla Román</u>, 485 F.3d 185, 191 (1st Cir. 2007) (emphasizing that "[t]he two steps are separate" and that "care must be taken not to conflate them").

Trust positions are ones of "professional or managerial discretion," a phrase that means "substantial discretionary judgment that is ordinarily given considerable deference." U.S.S.G. § 3B1.3 cmt. n.1. Not surprisingly, then, people holding trust positions are usually "subject to significantly less supervision" than those holding positions with "non-discretionary" responsibilities. <u>Id.</u> Examples of trust-position abusers include attorneys serving as guardians who fleece their clients, bank executives who perpetrate fraudulent-loan schemes, and doctors who sexually abuse patients during exams. <u>Id.</u> But not <u>ordinary</u> bank tellers who embezzle – sure, they have access to all kinds of valuable things, yet nothing they <u>typically</u> do (adding and taking cash from a till, for example) involves the type of complicated,

case-specific judgment calls that are given special deference, with little (if any) supervision.  See id.

Figuring out where a particular position falls on this spectrum can be tricky, and the cases present an array of circumstances.[3]  Turning back to our case, the distinguished judge found the evidence "more than sufficient" to support the abuse-of-

---

[3] Compare Sicher, 576 F.3d at 65, 72-73 (sole employee of a doctor's charitable organization stole money by forging checks:  in addition to her authority over "incoming donations, the payments of grants to researchers . . ., and maintenance of the accounting logs," her autonomy over hosting and facilitating fundraisers made her "the de facto manager and director" of the charity and thus her position one of trust), United States v. Chanthaseng, 274 F.3d 586, 587-90 (1st Cir. 2001) (mid-level bank manager stole from the bank through a scheme of making false "rapid deposit tickets" for fictional large cash deposits:  her supervisor had given her the authority (against bank policy) to countersign her own deposit tickets and did not review her tickets, which basically made "her the branch's sole decision-maker for those transactions" – meaning that her employment with the bank amounted to a position of trust), and United States v. O'Connell, 252 F.3d 524, 526, 528-29 (1st Cir. 2001) (office manager stole company money by forging the name of one of the owners on checks:  access to the company's checkbook and accounting software did not suggest that he had substantial discretionary authority within the meaning of § 3B1.3 – but his authority to transfer funds from the company's line of credit to its checking account and his close personal relationship with the owners certainly did), with Parrilla Román, 485 F.3d at 188, 190-92 (airline baggage handlers conspired with others to smuggle contraband:  even though they held security clearances giving them "ready access to restricted areas of the airport," because they had no discretion and, moreover, performed the types "of tasks that almost invariably require oversight," their positions fell outside the scope of the § 3B1.3 enhancement), and United States v. Reccko, 151 F.3d 29, 30, 32-33 (1st Cir. 1998) (switchboard operator at police headquarters tipped off a suspect about an upcoming raid:  even though her job gave her access to important information, it "involved no significant discretionary authority" and so was "on a par with the bank teller" post that we know is a "non-trust position[]").

trust enhancement. "As I understand it," the judge said, Dr. Grover picked codes "on a super bill, and [Zehrung], when she received those codes, deliberately and consciously upcoded them to bill for services" that no one had "actually performed." She did the billing with "no supervision," the judge added – "[t]here was no direct oversight, no review," he repeated again – and "she assumed complete financial control within the office." And, the judge suggested, her position made it significantly easier for her to commit the crime charged.

Our standard of review is familiar. We assess a judge's guidelines interpretation de novo. E.g., United States v. Cannon, 589 F.3d 514, 516-17 (1st Cir. 2009). We check his fact findings for clear error. Id. at 517. And we review his application of the guidelines to a particular case on a "sliding scale," with the intensity increasing the "more law-oriented" – as opposed to "fact-driven" – the judge's conclusion is. See Sicher, 576 F.3d at 70 & n.6; accord United States v. Gerhard, 615 F.3d 7, 32 (1st Cir. 2010). The parties bicker about where on the scale our judge's decision falls. But we need not referee their dispute, because regardless of who is right, we are not quite sure what to make of the judge's decision.

For starters, the judge did not say what discretionary authority Dr. Grover had entrusted Zehrung with. True, the judge did mention her role in the billing process. But the discretion

evidence there points in a couple of directions. The doctor's testimony about picking codes for Zehrung to enter into the computer seemingly suggests that her position was more like a typical bank teller, who has access needed to commit the crime charged but has little (if any) professional or managerial discretion in performing her tasks. Cf. Parrilla Román, 485 F.3d at 191 (stressing that "'[o]pportunity and access' do not equate with substantial discretionary judgment" (quoting United States v. Edwards, 325 F.3d 1184, 1187 (10th Cir. 2003))). Yet the presentence report whispers hints that Zehrung may have had discretion to change codes – that is one way (though not the only way) to interpret her comment to Dr. Grover, made after he had heard about the billing mess, that she was billing for "what should have been done" – which might put her in the category of discretionary decisionmakers covered by § 3B1.3. On this we are left to speculate, however.

The same is true about the judge's "she assumed complete financial control within the office" statement. Dr. Grover did say that Zehrung had "control" of "the checkbook" and "accounts payable." But he did not elaborate. So was the judge inferring that the doctor had charged her with exercising her own judgment over these areas[4] (which might suggest she held a trust position)?

_____

[4] And perhaps over accounts receivable – recall how she explained the uptick in revenues by saying that she had been "working" "old accounts."

-8-

And if yes, on what did the judge base this inference?  If only the presentence report could straighten this all out.  <u>See</u> Fed. R. Crim. P. 32(i)(3)(A) (noting that judges at sentencing "may accept any undisputed portion of the presentence report as a finding of fact").  Alas, the report is no help, because it based its enhancement recommendation exclusively on her "coding and billing" duties.

Do not get us wrong – we know that sentencing judges need not explain their reasoning in exquisite detail, especially when the reasons are "evident from the record."  <u>United States</u> v. <u>Stella</u>, 591 F.3d 23, 28 (1st Cir. 2009) (citing, among other cases, <u>Sicher</u>, 576 F.3d at 71).  Obviously, they must say in "open court" why they picked a "particular sentence," 18 U.S.C. § 3553(c), though they need not "be precise to the point of pedantry," <u>United States</u> v. <u>Fernández-Cabrera</u>, 625 F.3d 48, 53 (1st Cir. 2010).  And sure, they "must – for any disputed portion of the presentence report or other controverted matter – rule on the dispute," Fed. R. Crim. P. 32(i)(3)(B), though "we have found that [they] implicitly resolved the facts when [their] statements and the sentence imposed showed that the facts were decided in a particular way," <u>United States</u> v. <u>Van</u>, 87 F.3d 1, 3 (1st Cir. 1996).  But – and it is a big "but" – in the end we must be able to figure out what they "found <u>and</u> the basis for the findings to the extent necessary to permit effective appellate review."  <u>Id.</u> (emphasis added); <u>see also</u> <u>Rita</u>

v. United States, 551 U.S. 338, 358 (2007) (stressing, among other things, that "[b]y articulating reasons, even if brief, the sentencing judge . . . assures reviewing courts (and the public) that the sentencing process is a reasoned process"). And that, unfortunately, we cannot do here, given how an abuse-of-trust enhancement is not inevitable on this record. Needing more help, we see no choice but to vacate Zehrung's sentence and remand to the same judge for further findings about whether she should be punished for abusing a position of trust. See, e.g., United States v. Montero-Montero, 370 F.3d 121, 123-24 (1st Cir. 2004); United States v. Medina, 167 F.3d 77, 80-81 (1st Cir. 1999); Van, 87 F.3d at 3-4.

**Sentence vacated and case remanded with instructions**.